[No. 8630.   Department One. — May 6, 1885.]

P. B. GALLAGHER, RESPONDENT, *v.* MARKET STREET RAILWAY COMPANY OF SAN FRANCISCO, APPELLANT.

EVIDENCE — MEDICAL WORKS. — In an action to recover damages for personal injuries, a medical book, although proved to be of standard authority, is not admissible in evidence to prove the nature and probable effect of the injuries.

ID. — The books to which a medical expert refers cannot be resorted to in order to support his testimony, but they may be used to contradict or discredit him.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order refusing a new trial.

The facts are stated in the opinion of the court.

*McAllister & Bergin,* for Appellant.

*G. D. Buckley,* for Respondent.

McKEE, J. — This was an action to recover damages for personal injuries caused by the wrongful expulsion of the plaintiff, by an officer of the defendant, from one of its street cars. On the trial of the questions at issue in the case J. M. Sharkie was called and sworn as a witness on behalf of the plaintiff, and testified that he was a physician and surgeon by profession, and had been in practice since 1849. Thereupon a book, entitled, "A System of Surgery, Pathological, Diagnostic, Therapeutic and Operative," by Samuel D. Gross, published in Philadelphia, was exhibited to the witness, and he was asked: —

"Are you acquainted, sir, with 'Gross on Surgery?'"   In response to which the witness answered: —

"Yes; it is recognized as a standard work on surgery . . . .

and I consider it good authority on the subject on which it treats."

This was all the testimony given by the witness. No questions were asked him, in connection with the book or otherwise, as to the alleged injuries, which were the subject-matter of the action. But upon the testimony of the witness, counsel for the plaintiff insisted upon his right "to read from said book, as though the author were a witness then and there present in court, and testifying in the case before the jury"; and in the exercise of that asserted right, he offered to read in evidence extracts from the book upon the following propositions: (1) That wounds to joints are very dangerous, no matter how trivial. (2) That lacerated wounds are more to be dreaded than incised wounds. (3) That the larger the joint the more danger from the wounds. (4) That anchylosis, or stiffening of the knee, may set in from the most trifling wounds of the joints. (5) That a tendon may be impaired or may be injured without the consequence of much inflammation, etc.

To the right of the plaintiff to read the book, or any part of it, as evidence, and to each offer of evidence, as it was made, and to the reading from the book at all, the defendant objected upon the ground that nothing contained in the book was relevant, material, or competent evidence, but the objections were severally overruled, and the plaintiff read the book, at great length, to the jury, as evidence. In *People* v. *Wheeler*, 60 Cal. 581, we held it was error to permit the district attorney, against the objection of the defendant, in the trial of a criminal action, to read in his closing argument to the jury as part of his argument, excerpts from "Brown's Medical Jurisprudence of Insanity," which tended to sustain the theory of the prosecution upon the question of the insanity of the defendant—one of the questions at issue in the case—without having given the book in evidence or proved that it was a work of standard authority. But in this case such preliminary proof was made, and being made, the book was offered and read in evidence. The question therefore arises, whether a medical book, containing the author's opinions and views upon the subject of which it treats, is admissible in evidence to prove the nature of injuries sustained by the plaintiff in the action, and their probable effect?

Under common-law procedure it was not competent to read books of science to a jury as evidence, because the statements therein contained were not only wanting in the sanctity of an oath, but were made by one who was not present, and was not liable to cross-examination. For that reason they were excluded, notwithstanding the opinion under oath of scientific men, that they were books of authority. (*Ashworth* v. *Kittridge*, 12 Cush. 193; *Commonw.* v. *Wilson*, 1 Gray, 67; *Washburn* v. *Cuddihy*, 8 Gray, 430; *Melvin* v. *Easley*, 1 Jones (N. C.) 387; *Carter* v. *State*, 2 Ind. 617; *Fowler* v. *Lewis*, 25 Tex. 380.)

But it is contended that the common-law rule has been changed by the Code law. Section 1936 of the Code of Civil Procedure makes "historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, . . . . *prima facie* evidence of facts of general notoriety and interest," and the question arises, whether such books, which were not regarded before the adoption of the Codes as competent evidence, are not, by force of that provision of the Code, made competent. Doubtless the intention of that legislation was to extend the rule of evidence rather than to restrict it. But the extension is limited by the terms "facts of general notoriety and interest."

What are "facts of general notoriety and interest?" We think the terms stand for facts of a public nature, either at home or abroad, not existing in the memory of men, as contradistinguished from facts of a private nature existing within the knowledge of living men, and as to which they may be examined as witnesses. It is of such public facts, including historical facts, facts of the exact sciences, and of literature or art, when relevant to a cause that, under the provisions of the Code, proof may be made by the production of books of standard authority. So Mr. Justice Story, in *Morris* v. *The Lessees of Harmer's Heirs,* 7 Peters, 558, speaking upon this subject, says : "Historical facts of general and public notoriety may indeed be proved by reputation, and that reputation may be established by historical works of known character and accuracy. But evidence of this sort is confined in a great measure to ancient facts which do not pre-suppose better in existence; and where from the nature of the transaction or the remoteness of the period, or the

public and general reception of the facts, a just foundation is laid for general confidence. But the work of a living author, who is within the reach of the process of the court, can hardly be deemed of this nature." And the appellate court of New York says: "Such evidence is only admissible to prove facts of a general and public nature, and not those which concern individuals or mere local communities." (*McKinnon* v. *Bliss*, 21 N. Y. 210. See also, *Bogardus* v. *Trinity Church*, 4 Sand. 633; *Missouri* v. *Kentucky*, 11 Wall. 395.)

Such facts include the meaning of words and allusions, which may be proved by ordinary dictionaries and authenticated books of general literary history, and facts in the exact sciences founded upon conclusions reached from certain and constant data by processes too intricate to be elucidated by witnesses when on examination. (1 Whart. Ev. § 667.) Thus mortuary tables for estimating the probable duration of the life of a party at a given age, chronological tables, tables of weights, measures and currency, annuity tables, interest tables, and the like, are admissible to prove facts of general notoriety and interest in connection with such subjects as may be involved in the trial of a cause. (*Wager* v. *Schuyler*, 1 Wend. 533; *Schell* v. *Plumb*, 55 N. Y. 592; *Mills* v. *Catlin*, 22 Vt. 98; *Donaldson* v. *Missouri R. R. Co.* 18 Iowa, 291.)

But medicine is not considered as one of the exact sciences. It is of that character of inductive sciences which are based on data which each successive year may correct and expand, so that, what is considered a sound induction last year may be considered an unsound one this year, and the very book which evidences the induction, if it does not become obsolete, may be altered in material features from edition to edition, so that we cannot tell, in citing from even a living author, whether what we read is not something that this very author now rejects. (Whart. Ev. § 665.) And as we said in Wheeler's case, *supra*, "if such treatises were to be held admissible, the question at issue might be tried, not by the testimony, but upon excerpts from works presenting partial views of variant and perhaps contradictory theories."

Of course, the author himself, or any other physician, may be called upon to testify to opinions and professed facts, which

may be relevant to a cause on trial, derived by him not only from his experience or observation, but also from standard authorities which he may have read and studied in the line of his profession. Such testimony is admissible on the maxim of *cuilibet in arte sua credendum;* and it comes from one who, like every other witness, testifies under the solemnity of an oath, and is subject to cross-examination as to his conclusions; and the jury have the right to weigh his evidence and determine how far his conclusions are probable or authoritative. But where his testimony as an expert may be founded on standard authorities, to which he refers in his direct testimony, even under such circumstances, the witness cannot resort to the books to which he refers to support his testimony. So in *Commonw.* v. *Sturtevant,* 117 Mass. 122, where an expert, in his direct testimony, was asked if he concurred with the views expressed in "Taylor's Medical Jurisprudence" on the subject of his testimony, and the book was passed to him to read therefrom to the jury the opinions in the book, with which he concurred, it was held that it could not be done. (See also *Commonw.* v. *Brown,* 121 Mass. 69–75.) This as a general rule is sustained by the great weight of authority; but it is subject to this exception, namely, that books referred to by an expert, to sustain the opinions which he has expressed, may be used to contradict him or to discredit him. Thus, in *Huffman* v. *Click,* 77 N. C. 55, where a physician in his testimony referred to "Hammond's Work on the Diseases of the Nervous System," the book was admitted in evidence for the purpose of discrediting him. To the same effect will be found *City of Ripon* v. *Bittel,* 30 Wis. 619, and *Pinney* v. *Cahill,* 48 Mich. 584.

In the trial of the latter case a veterinary surgeon, examined as an expert, in his direct examination gave it as his opinion that the injury, which was the subject-matter of the action, was attributable to a certain cause, which he undertook to define, and to support his opinion and definition, referred to a standard work known as the "Modern Horse Doctor," by Dr. Dodd. Upon his cross-examination the work was offered and admitted in evidence for the purpose of discrediting him; and the Supreme Court said it was rightly admitted, because "the expert borrowed credit for the accuracy of his statement by

referring his learning to the books before mentioned, and by implying that he echoed the standard authorities like Dodd. Under the circumstances it was not improper to resort to the book, not to prove the facts it contained, but to disprove the statement of the witness, and enable the jury to see that the book did not contain what he had ascribed to it." The objection to the admissibility of the book in evidence should have been sustained.

Judgment and order reversed and cause remanded for a new trial.

Ross, J., and McKinstry, J., concurred.