## UNITED STATES v. PERKINS.

(District Court, E. D. South Carolina. January 28, 1915.)

1. CRIMINAL LAW ⊗≈494— INSTRUCTIONS—WEIGHT OF MEDICAL TESTIMONY.
   Defendant in a criminal trial is not entitled to an instruction that opinions of medical experts admitted in evidence, even though admittedly, derived only from the opinions of others expressed in books, if uncontradicted by other experts, must be accepted and acted upon by the jury as absolute proof.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1081; Dec. Dig. ⊗≈494.]

2. CRIMINAL LAW ⊗⇒814—TRIAL—INSTRUCTIONS.
   The charge in a criminal case must be directed to the issues arising under the testimony, and should be confined to such defenses as are supported by legal testimony sufficient to support a verdict.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1821, 1833, 1839, 1860, 1865, 1883, 1890, 1924, 1979–1985, 1987; Dec. Dig. ⊗⇒814.]

3. CRIMINAL LAW ⊗⇒1173—TRIAL—INSTRUCTIONS.
   That the jury, on a trial for manslaughter under a statute defining two degrees of the crime, were not instructed as to the second degree, to which none of the evidence was applicable, was not in any case prejudicial to defendant, where the sentence imposed was within that prescribed for the lower degree.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3164–3168; Dec. Dig. ⊗⇒1173.]

4. WORDS AND PHRASES—"EXACT SCIENCE"—"INEXACT SCIENCE."
   "Exact sciences" are those sciences which are immutable and unchangeable. Such sciences include arithmetic, geometry, algebra, astronomy, and chemistry. An "inexact science" is one which creeds change continually, as, for example, medicine.

Criminal prosecution by the United States against George B. Perkins. On motion by defendant for new trial. Denied.

Francis H. Weston, U. S. Dist. Atty., of Columbia, S. C., and J. Waties Waring, Asst. U. S. Dist. Atty., of Charleston, S. C., and B. W. Crouch, Asst. U. S. Dist. Atty., of Saluda, S. C., for the United States.

J. P. K. Bryan and W. C. Miller, both of Charleston, S. C., for defendant.

SMITH, District Judge. A motion has been made on the minutes of the court for a new trial in this case.

[1] The principal ground urged is as to the view taken by the court of the value of the expert medical evidence, and the failure of the

---

presiding judge to charge that the opinions of these experts, even when derived admittedly only from the opinion of others expressed in books, yet being testimony in the cause uncontradicted by other experts, was to be accepted and acted on by the jury as absolute proof. This position would assume that the jury is bound to accept any opinions, however absurd and unreasonable, expressed as matter of opinion by an expert who was produced as a witness, simply because no other expert was introduced to contradict him. There is a fundamental difference between hearing testimony and being compelled to accord assent to its conclusions. The great weight of reason and authority is against allowing the statements in medical books to be introduced in testimony. The state of South Carolina has passed a statute (Code of Laws 1912, § 4007) permitting such books to be read in civil and criminal cases in the state courts; but it is well settled that such statutes have no application to criminal cases in the federal courts. Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429. The subject is treated at length in an opinion rendered by the Circuit Court of Appeals for the Eighth Circuit in the case of Union Pacific Ry. Co. v. Yates, 79 Fed. 584, 25 C. C. A. 103, 40 L. R. A. 553.

[4] There are certain books on the sciences known as the "exact sciences," which can be profitably used in testimony because the truths and statements in those sciences are immutable and unchangeable. The conclusions in arithmetic, algebra, and geometry are the same to-day as they were a thousand years ago. Euclid's problems and their demonstrations are as absolute as the day they were written. The phenomena of the heavens in astronomy and the deduced and recorded results of chemistry, once made, remain unchangeable. These are the exact sciences, as are some of the branches of applied physics depending upon mathematical calculations. Medicine, however, is termed an "inexact science," one of the most inexact. Its creeds change continually, and the medical books of a century ago, or half a century, for that matter, are as obsolete and useless in many particulars as the works of Galen or Hippocrates. The latest medical opinion has vogue, only to be shortly superseded or laid aside. To permit a medical book to be presented to a jury as evidence is to present a witness who cannot be examined or cross-examined, whose veracity and intelligence cannot be questioned or tested, yet whose general statements and conclusions may be wholly inapplicable, when properly analyzed to the facts of the particular case.

Testimony given from such books is by some authorities defined as hearsay, and it is hearsay of a most pronounced character, for it rests simply upon the information given by one as to whose sources of information there can be no opportunity of inquiry before the jury. For these and other reasons the great weight of authority has rejected them as reliable assistants to the ascertainment of truth in a jury trial and has refused to allow them to be read before a jury. But this precaution would be useless if, in lieu of reading them before a jury, an expert was allowed to state them. The statement made in a medical book, if inadmissible in that form, does not become admissible because it is read out of the presence of a jury and its statements

then repeated by rote before the jury. The statements of the physicians in this case, then, so far as they were opinions based on and the repetition of statements contained in books, were subject to the same objections as the books themselves upon any consideration of the weight that should be given to such testimony. The difficulty in the medical opinion in this case is one that affects most medical expert testimony and has contributed largely to bring it into its present undeserved disrepute. It is the habit of the so-called experts, and especially the medical expert, to make general statements based on insufficient data—to argue from the particular to the general, and not from the general to the particular.

All conclusions of fact deduced from circumstances must be largely theories of probability. Absolute truth is unattainable. We can in such cases arrive only at relative or probable truths. The question for a court or jury is what is the most reasonable or probable deduction. In a criminal case by our law that deduction must be the only reasonable one to be drawn, if it be as to the guilt of the accused. His guilt must be established as the only reasonable conclusion, and he cannot be found guilty if any reasonable doubt exists compatible with his innocence. But it is still a theory of probabilities. The expert—the medical expert—will as against a general rule often cite an exception as of equal reasonable weight.

Chloral is a drug of very wide, if not continual, use in cases of sleeplessness. The ordinary dose is 15 grains. Usually that produces a refreshing sleep of five to six hours; but the books report, according to the witnesses, a case where a party died after taking a dose of 10 grains. The books, they testify, also report a case of delirium in a party after taking a dose of 15 grains. Therefore in any particular case the jury are to assume that not the general rule, but the particular, applied. They are not to reason that upon the great weight of the probabilities the effect of the drug was as it was in the great majority of cases, but must assume its action was as it was in the single and exceptional case. That the cases referred to in the books may have been of a most exceptional kind frequently fails to strike them. That the patient who died from 10 grains, or became frenzied from 15 grains, may have been in an extraordinary physical condition of heart, so weak that a small dose of any kind would have precipitated the catastrophe, does not seem to occur to them. And when this case is cited from a book, how is it possible to examine or scrutinize into the circumstances?

Counsel for the accused, in his desire to assist the presiding judge to come to a correct conclusion as to whether a consideration of the best medical opinion on this subject of chloral would not show that error occurred in the charge to the jury on that subject, has sent for his examination some 12 medical works of supposed approved standing. These works are largely works on Medical Jurisprudence and Toxicology, written to assist in the detection of the *possible* explanation of deaths that may have been due to poisoning. They dwell more on the exceptional than the general, because they are not written from the viewpoint of showing the beneficial effects of the drugs when properly used, but what drugs are capable of being used for deleterious

and destructive purposes. Even these, however, are full of the quali-- fications and contradictions that mark most books on general pharmacology; that, for instance, one most strongly urged as of authority, viz., "A Text-Book of Pharmacology and Therapeutics or the Action of Drugs," by Arthur R. Cushing, M. A., M. D., F. R. S., etc., fifth edition, published in 1913. On page 180, under the head of "Soporifics," the author says:

"Chloral is still the best known and most widely used member of this group."

On page 195 the dose is given as 10 to 30 grains, which may be repeated if necessary in one or two hours. Again, on page 189, such a dose—

"produces drowsiness and weariness, which soon pass into a condition resembling natural sleep very closely. * * * As a *general rule* the sleep passes off in five to eight hours and leaves no unpleasant results, but sometimes headache, giddiness, and confusion are complained of. *Occasionally* no real sleep is produced by chloral; a condition exactly resembling alcoholic intoxication following its administration and continuing for some time." And "unlike the anæsthetics and alcohol, however, chloral *rarely* causes excitement."

So again, in "Principles and Practice of Medical Jurisprudence," by Alfred Swaine Taylor (6th Edition, 1910) p. 599:

"Chloral hydrate cannot be considered in itself to have a high degree of toxicity, but in diseased conditions of the heart it is a dangerous drug. Its deleterious action seems to be mainly exerted on the *heart*."

Thirty-nine grains, says the author, once caused death in a woman, but 120 grains is a *safe* dose for an adult distributed over 24 hours. So again, "A Manual of Legal Medicine," by Justine Herold (1897) on page 104, as to chloral:

"In *large* doses * * * in *some* cases delirium may supervene and take the place of the sleep which it *generally* causes."

And on page 105:

"The smallest recorded *fatal* does is 30 grains, while, on the other hand, enormous quantities (more than one ounce) have been swallowed with impunity."

And so in all the other nine works submitted and which have been carefully consulted to see if in the court's charge any injustice was done the accused. They all state chloral has potential dangerous qualities; they all state that the usual safe dose is 15 to 30 grains; they disagree as to what has been recorded as a fatal dose; they disagree in the cases cited; but all agree that it is a most widely used remedy of a safe character in proper doses with occasional or exceptional cases recorded where its action was unusual. No case, however, is recorded where a dose of 15 grains eventuated in homicidal delirium.

To have read a series (how limited?) of such books before a jury, couched in their technical medical parlance, would have been only to confuse. The testimony of the two physicians in the case based upon the books was practically to the same effect as these books. Like

all such experts, however, they did not properly qualify the exceptional instances stated by them, by stating how the general rule was, until under examination by the court they testified that, while both of them used chloral in their practice, they had never known of a case of frenzy produced by a dose of 15 grains. The counsel for the defendant thinks that the case should have gone to the jury as if the testimony of the physicians on such exceptional instances was absolute as uncontradicted testimony, in lieu of the jury being instructed that they had a right to consider whether the general rule applied under any reasonable theory of probabilities excluding any reasonable doubt to the contrary. Which was most reasonable, that the accused had been rendered so frenzied by a dose of 15 grains of chloral that he became thereupon in the condition of mind which made him kill one and nearly kill two more of his fellow passengers, or that out of impatience, petulance, self-will, a desire to escape pain, or previous accustomed self-subjection to the drug, he took so large a dose (enormously beyond his physician's directions) that he voluntarily brought on a frenzied state of intoxication? It was left to the jury to say which was most reasonable beyond a reasonable doubt, and that still seems to the court the correct exposition of the law.

What has been said here about chloral applies equally to the charge upon the subject of alcoholism or delirium tremens, with the difference, however, that the effects of alcohol are of much more common and popular observation than those of chloral. The jury was on this point also charged as to the reasonableness of the defendant's action being explained by an attack of delirium tremens, of which reasonableness they were to be the judges. Charges to a jury of general principles of law which have no application to the testimony in the particular case are always to be avoided as having the effect only of misleading or confusing the jury. Why in a case of alleged insanity, where no self-defense be shown, should the jury be charged the principles of law applicable to self-defense? And why in a case purely of manslaughter should the jury be charged on the definition of murder? So why charge a jury on the hypothesis of delirium tremens, if there is nothing in the case that shows delirium tremens? The testimony of the accused was that he did not have delirium tremens. He testified with extraordinary coolness and clearness as to what occurred. He said he took first one dose of the chloral (15 grains), then immediately (the medical evidence not showing that there is any immediate action in the case of chloral taken through the mouth) under the impulse of his sensations drank the whole of the 480 grains of chloral and then lost all consciousness and memory.

Dr. Wilson never testified that the prisoner had, or had had, delirium tremens. He only testified in a general way to the symptoms and causes of it; the essential prerequisite being excessive alcoholic absorption. He did not even undertake to give an opinion that the prisoner had had delirium tremens. Dr. Roberts never testified that the prisoner had delirium tremens, he testifying that when consulted in New York the prisoner's appearance was quite sane and natural; but his own statement of his symptoms suggested that he might be

221 F.—8

on the verge of delirium tremens. The jury were instructed that they were entitled to consider Dr. Roberts' testimony in the light of his acts as giving or depriving his testimony of weight. Could it be supposed that, if he had really thought that the prisoner was on the verge of delirium tremens, he would have turned him loose on a crowded steamer, with drugs in his hands of such terrible potentiality as described by Dr. Roberts? The prisoner testified that he had not been drinking excessively, and his brother-in-law, Mr. Holten, testified to the same effect. Wherein, then, was there legal justification for a charge to the jury upon the existence of mania a potu or delirium tremens as an excuse for crime, when there was no sufficient evidence of either to base a verdict or raise a reasonable doubt upon? Were a judge to charge the jury upon matter not called for by the testimony introduced, but simply because the theory or hypothesis was advanced by counsel, the charge as a whole might entirely drift away from the real issues in the cause.

[2] The charge must be directed in a criminal case to the issues arising under the testimony. The plea of not guilty puts everything in issue; but the testimony restricts the issue to be determined to such defenses as are supported by any legal testimony sufficient to support a verdict. The prescription of a physician obeyed in good faith is a complete protection for responsibility for the results thereby caused. But, as the jury were charged, it must be obeyed in good faith. His prescription cannot be used as a pretense or excuse when not obeyed. The consequences would be too dreadful. Modern medicine deals in drugs too potent in their effects when taken in excessive doses to permit men to shield themselves under the pretense of a physician's prescription which they have disobeyed. It would offer too great an opportunity for revenge, spite, and malice to seek gratification under the madness of an artificial frenzy and then claim immunity because of willful error in the disobedience of the instructions as to the dose.

The issue was fairly put to the jury to determine whether or not the intoxicated frenzy in this case proceeded from the voluntary act of the prisoner. The jury has found that it did; that the intoxication was caused by the voluntary act of the prisoner. And after considering the whole testimony the court sees no sufficient reason, either in any error of law in the charge or ignoring of the testimony by the jury, to disturb that verdict. A whole shipload of crew and passengers have been imperiled; an innocent party has been put to death; two others, one the captain of the ship, upon whom the safety of all others might depend, were wounded. All this took place in a crowded drawingroom on a steamer filled with women, who might also have been assassinated. The evidence is quite sufficient to justify the inference beyond a reasonable doubt that the prisoner had voluntarily, while in a perfect condition of sanity and reasonableness, from caprice, petulance, disgust, or a simple desire to relieve himself from pain, disregarded the orders of his physician and intoxicated himself to a degree that eventuated so fatally. The verdict, therefore, should not be disturbed.

[3] That the jury was not charged as to the definition of manslaughter that did not apply to the facts of the case is no ground for a new trial. The only manslaughter of which the prisoner could be guilty is the manslaughter defined in the first clause of section 274 of the Criminal Code of the United States. The second clause also declares to be manslaughter a homicide perpetrated under a set of facts that under no circumstances could be deduced from the testimony in this case. But the sentence imposed was the one contemplated and provided for the lowest form of manslaughter. The prisoner is therefore not prejudiced. He has been sentenced as if he had been found guilty only of the second and lower degree of manslaughter, and having had the benefit of that it makes no difference to him whether or not the definition of this form of manslaughter was not given to the jury as in no wise applicable to the facts of this case. He has had the benefit of the lower offense in the lower sentence.

The motion for a new trial accordingly is refused.