W. B. TILGHMAN v. SEABOARD AIR LINE RAILWAY COMPANY.

(Filed 31 May, 1916.)

**1. Evidence—Witnesses—Medical Experts—Text-books—Appeal and Error.**

Where the plaintiff contends that he was suffering with locomotor ataxia as a result of an injury he alleged was negligently inflicted upon him by the defendant, and defendant's medical expert witnesses have testified that locomotor ataxia could not result from a wound or personal injury, the testimony of one of these witnesses, brought out on cross-examination, that certain authors in their works on the subject stated it could so result, is substantive testimony of the opinion of such authors introduced without their oath and without subjecting them to cross-examination, and is reversible error.

**2. Same—Impeaching Evidence.**

While it is competent, under certain circumstances, to impeach the testimony of a medical expert witness by asking him, on cross-examination, whether text-books from which he informed himself had not given contrary opinion to his own, this does not apply where the witness has not referred to the text-books on his direct examination, and the context is brought out as substantive evidence and is not confined by the court to the purpose of impeachment.

CLARK, C. J., dissenting.

CIVIL ACTION tried before *Connor, J.,* and a jury, at January Term, 1916, of WAKE.

The plaintiff brought this action to recover damages for personal injuries sustained in a collision on defendant's railroad near Granite, N. C., 19 November, 1913. At the time of the collision plaintiff was employed as conductor on defendant's passenger train No. 84, running

from Columbia, S. C., to Richmond, Va., and this train collided with southbound train No. 81, running from Richmond, Va., to Columbia, S. C., and to points south of Columbia.

At Norlina, N. C., on the trip north, the train in charge of plaintiff as conductor (No. 84) stopped, and plaintiff received an order fixing a meeting point with southbound train No. 81, and alleged negligence in connection with this order is the basis of plaintiff's claim for damages.

Plaintiff alleged, and offered evidence tending to prove, that his injury was due to the negligence of the defendant in ordering train No. 81 to meet train No. 84 at Granite, N. C., and train No. 84 to meet train No. 81 at Grandy, Va., and that the defendant was negligent in that it delivered to plaintiff at Norlina, N. C., a train order for the meeting of his train, No. 84, with train No. 81, "written in such form and manner that if the same was intended to refer to any other meeting place than 'Grandy,' nevertheless, the same was so negligently written that the word appeared to be 'Grandy'; and in that when the plaintiff read his said order to the defendant before leaving Norlina he did so read it aloud in a plainly audible and distinct tone of voice, 'Grandy,' the defendant negligently assented to and approved the said reading and pronunciation of the said 'Grandy'; and in that thereafter, and before the plaintiff's train reached the station, Granite, N. C., the defendant negligently twice read the said train order to the plaintiff, and each time read and pronounced the same in respect to the meeting place therein designated, 'Grandy.' "

The defendant denied that the collision was in any manner due to its negligence, and pleaded contributory negligence and assumption of risk as defenses. The fact of the collision was not denied, but it was contended by the defendant that the sole cause of the collision was the negligence of the plaintiff himself in failing to properly read the order given him, and in failing to stop at Granite, N. C. It appeared in evidence that plaintiff's train had passed the station at Granite, and was proceeding north to Grandy when the collision occurred.

The plaintiff, W. B. Tilghman, testified that when he arrived at Norlina, N. C., on the run from Columbia, S. C., to Richmond, Va., on the morning of the collision, the operator at Norlina, by the name of Watson, gave him an order to meet train No. 81 at Grandy; that Grandy is about 30 or 39 miles from Norlina, and Granite is a little over 7 miles from Norlina; that Granite is between Norlina and Grandy; that when he got this order to meet train No. 81, engine 93, at Grandy, he read it to the operator and used the word "Grandy" distinctly, and the operator didn't say anything; that he had two copies of the order, and delivered one to Engineer Beckham, who read the order to him, and read the station "Grandy"; that when the train passed Granite it was running between 50 and 60 miles an hour.

"I read it to him first, and when I got to the word Grandy, I said, 'Meet where?' and he spelled it out, G-r-a-n-d-y, with the order in his hand. I said something to him about there being two stations with the names somewhat similar. I don't exactly remember the words; it was something to this effect: I said, 'Bryant, I think it is liable to cause trouble having stations so near, so similar in names, so close together on the main line—names so similar as Grandy and Granite'—something to that effect; I don't remember exactly. I had some conversation with Mr. Bryant about Grandy and Granite. I did not inquire of him what the meeting point on the order was; I asked him to spell it out. The rules do not require the baggage master to read orders to the conductor—merely require that I should read the order to Mr. Bryant."

The plaintiff's witness, J. T. Bryant, testified to the same effect.

J. L. Watson, defendant's operator at Norlina, N. C., testified that he received the order offered in evidence by defendant over the telephone from the dispatcher on the morning of the collision; that the order was made in triplicate by the use of carbons; that he wrote it down as he received it over the telephone; that after he received this order, he spelled the name of the station over the telephone to the dispatcher at Richmond, G-r-a-n-i-t-e, and that he again spelled it over the telephone, after it was made complete by the signature of the conductor. He testified further that Conductor Tilghman read the order over to him, and read the meeting point as Granite.

L. W. Perkins testified that he was operator for the defendant at La Crosse, Va.; that he was on the telephone line with the operator at Norlina, N. C., and dispatcher at Richmond, Va., and heard the order given for train 81 to meet train 84 at Granite, and that he heard the operator at Norlina spell the meeting place, "G-r-a-n-i-t-e"; that the same order was intended for him, to be given by him to the conductor of southbound train 81; that he copied it at the time and gave a copy to Shannonhouse, conductor on train 81. The copy of the order delivered to Conductor Shannonhouse appears in the record as an exhibit, and shows the meeting point to be Granite.

The defendant showed by the testimony of W. B. Carlyle, Walter Moore, J. R. Bissett, and W. L. Stanley that the copy of order offered in evidence as Exhibit "A" was found on the body of Engineer Beckham after the collision.

C. E. Matthews, one of the defendant's conductors who has been in the railroad service for fifteen years, testified that if a conductor has doubt about the meeting point fixed by his train order, it is his duty to stop at the first station and have it corrected or straightened out and to satisfy himself that he was right; that when he reached one of the stations about which he was in doubt, it would be his duty to stop.

W. P. Clements, a conductor of twenty-five years experience, testified: It is the duty of a conductor, in case of doubt, to take the safe side and run no risk. If a conductor should take an order fixing a meeting place, and he was in doubt about the meeting point, it would be his duty to stop immediately. If the conductor should reach one of the points that created the doubt, it would be his duty to stop there and find out.

L. W. Renn, one of the defendant's conductors, testified that it was necessary for him to know the meeting point of trains 84 and 81 in handling his train at Norlina, and that on the morning of this collision, and before the collision occurred, he read the order addressed to conductor of train 84, and read the meeting point "Granite," and told the engineer that the meeting point was Granite, and this information was used in operating his train at Norlina. This was corroborated by Engineer Tudor.

The plaintiff offered evidence tending to prove that he was suffering with locomotor ataxia, and that it was caused by the injuries he received in the collision.

The defendant introduced Dr. C. O'H. Laughinghouse and other medical experts, who testified that locomotor ataxia could not be caused by trauma, a wound or an injury, and that the sole cause of this condition was syphilis.

On the cross-examination of Dr. Laughinghouse, the court permitted the following questions to be asked and answered over the objection of the defendant:

Q. Have you read Strumpell? It is a book on locomotor ataxia. A. Yes.

Q. Published in 1914? A. Not in 1914, no.

Q. Have you read the 1912 edition? A. Yes.

Q. I will ask you if he does not lay down trauma as a producing cause of locomotor ataxia?

Q. I will ask you if Strumpell is not an authority on locomotor ataxia? A. He is considered so; yes.

Q. You consider him so? A. Yes.

Q. I will ask you if Strumpell does not lay down trauma as one of the producing causes of locomotor ataxia? A. In the 1913 edition my recollection is he does.

Q. Have you read Osler? A. Yes.

Q. What edition? A. Eighth, 1907.

Q. I will ask you if he does not lay down trauma as one of the producing causes of locomotor ataxia? A. He does.

Q. He is good authority? A. Yes.

Q. Have you read Forsheimer? A. Yes.

Q. Is that good authority? A. Yes.

Q. I ask you if he does not lay down trauma as one of the producing causes of locomotor ataxia? A. He does, in his 1909 edition.

Q. Does not he do it in his 1914 edition? A. I do not know.

Q. I will ask you if each of these authors does not also state that a dormant condition of locomotor ataxia may be aggravated and brought into activity by traumatic injury? A. My recollection is that they do.

Q. Do not Strumpell, Osler, and Forsheimer, each one of them, state in rare cases locomotor ataxia has been produced by trauma? A. They state it is said to have been produced by trauma; yes.

The jury returned the following verdict:

1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? A. "Yes."

2. Did the plaintiff contribute to his injury by his own negligence, as alleged in the answer? A. "Yes."

3. What damage, if any, is the plaintiff entitled to recover? A. "$14,833."

Judgment was rendered in favor of the plaintiff, and the defendant appealed.

*Douglass & Douglass and R. N. Simms for plaintiff.*
*Murray Allen for defendant.*

ALLEN, J. It is not to be expected that we should discuss all of the assignments of error, ninety-four in number, and it is not conceivable that a judge commissioned to hold the courts of the State should have committed so many errors in the trial of an action to recover damages for negligence.

Much useless labor is imposed on counsel and the courts by the multiplication of exceptions, and the practice would seem to be defensible only upon the ground that counsel do not feel confident that any exception is well taken, but hope to form a chain strong enough to sustain a new trial.

We have carefully examined the exceptions arising on the first and second issues, and find no substantial error, but we are of opinion there was error in permitting the plaintiff to place before the jury on the cross-examination of Dr. Laughinghouse the opinions of three distinguished experts, Strumpell, Osler, and Forsheimer, when these opinions had not been given under the sanction of an oath, and when the experts had not been subjected to a cross-examination.

Mr. Chamberlayne in Modern Evidence, vol. 1, sec. 859b, says: "Judicial administration views, therefore, with conspicuous apprehension and suspicion the use, in dealing with the jury, of works of science containing a large proportion of statements resting upon incomplete observation and moral evidence," and he speaks of this field of investiga-

tion as the "fog-enshrouded, mirage-haunted house of the expert," the "battle-ground of theory," and the authorities in this State and elsewhere, except when allowed by statute, generally condemn the use of medical books in the trial of issues of fact, and if the book cannot be introduced to prove the opinion of the writer, the attempt to make the proof by examining a witness who has read the book simply subjects the evidence to the additional objection that the party must offer the best evidence, and that secondary evidence will not be admitted when the primary evidence is easily available.

The question has been considered in this State in *Melvin v. Easley,* 46 N. C., 386; *Huffman v. Click,* 77 N. C., 55; *Horah v. Knox,* 87 N. C., 483; *S. v. Rogers,* 112 N. C., 874; *Butler v. R. R.,* 130 N. C., 15; *Lynch v. Mfg. Co.,* 167 N. C., 98.

In *Huffman v. Click* the Court says, in speaking of the use of medical books before the jury: "If the work is read, it must be to prove the truth of the facts contained in it, and the justness of the conclusions which the author draws from these facts. But if medicine is a science (and it claims to be such), it belongs to that class called 'inductive science.' Such treatises are based on data constantly shifting with new discoveries and more accurate observation, so that what is considered a sound induction today becomes an unsound one tomorrow. The medical work which was 'a standard' last year becomes obsolete this year. Even a second edition of the work of the same author is so changed by the subsequent discovery and grouping together of new facts that what appeared to be a logical deduction in the first edition becomes an unsound one in the next. So that the same author at one period may be cited against himself at another. The authors of such works do not write under oath; the books themselves are therefore often speculative, sometimes mere compilations, the lowest form of secondary evidence; and as the authors cannot be examined under oath, the authorities on which they rely cannot be investigated nor their process of reasoning be tested by cross-examination. Such writings are nothing more or less than hearsay proof of that which living witnesses could be produced to prove. Wharton Law Evidence, sec. 665. "And in *Lynch v. Mfg. Co.,* where the general question as to whether *all* medical authorities agreed on a certain point was admitted: "It is very generally recognized that extracts from medical books are not admissible in evidence, and for the very sufficient reason that the author does not write under the sanctity of an oath and had not been subjected to cross-examination, and the decisions of this State are to the effect that statements from these books may not be presented as such in the arguments of counsel nor introduced by means of questions put on cross-examination, as by reading an opposing opinion from a text-book and asking the witness if it is true or not

42—171

true, for this would have the effect of putting the statement in evidence, and thus accomplish by indirection what is expressly forbidden, *Butler v. R. R.,* 130 N. C., 15; *Huffman v. Click,* 77 N. C., 55; *Melvin v. Easley,* 46 N. C., 386; for, as said by *Bynum, J.,* in *Huffman's case:* 'If this practice were allowed, many of our cases would soon come to be tried not on the sworn testimony of living witnesses, but upon publications not written under oath.'

"The principle, however, is not as exigent in case of cross-examination, and when a witness has testified as an expert, professing to have special training and knowledge from standard works of his profession, a general question of this kind may be allowed with a view of testing the value of his opinions."

These decisions are sustained by the opinions of other courts and by the text writers generally.

In *Allen v. R. R.,* 212 Mass., 191, it was held on the trial of an action of tort against a street railway company for personal injuries alleged to have been caused by a collision of cars, a medical expert, testifying for the defendant, could not be asked on cross-examination whether he was familiar with any authorities which said that a certain disease with which the plaintiff contended he was suffering as a result of the accident might come as a result of a blow, nor could he be asked questions about books written by persons other than himself. The Court said: "It hardly has been contended that the cross-examination of Dr. Baldwin was proper. The evidence thus obtained was plainly incompetent. It comes under the settled rule that neither medical books, though of recognized authority, nor the opinions of medical experts, unless testified to by themselves as witnesses, can be received as evidence (citing a number of Massachusetts cases). That cross-examination was directed mainly to showing what the opinion of other medical authorities were as to the effect of the plaintiff's alleged injuries in causing the disease called diabetes mellitus."

The Supreme Court of Michigan held that "It is error to read medical authorities to a witness on cross-examination." *Foley v. R. R.,* 157 Mich., 67.

And again: "The only circumstances under which medical books can be read in evidence are where the witness has based his opinion upon them and has referred to them as authority. The established rule is that it is incompetent to read from these books. This rule cannot be evaded on cross-examination." *Hall v. Murdock,* 114 Mich., 239.

In *Union Pacific Railway Co. v. Yates,* 79 Fed., 584, *Thayer, Circuit Judge,* says: "The authorities, both English and American, are practically unanimous in holding that medical books, even if they are re-

garded as authoritative, cannot be read to the jury as independent evidence of the opinions and theories therein expressed or advocated."

Following this statement, *Judge Thayer* gives the grounds for the exclusion of such books as evidence, and in a long list of cases cites *Melvin v. Easley,* 46 N. C., 386.

In *Chicago City Railway Co. v. Douglas,* 104 Ill. App., 41, one of the expert witnesses for defendant, who had not referred to any medical books or author as authority for the opinion which he expressed, and who had not been asked about any such book or author, was asked on cross-examination the following questions:

Q. Did you ever read any books on medicine or surgery that give blows and injuries as a cause for cystic tumors? A. "Yes."

Q. There are a number of authors that give blows and injuries as the exciting cause of cystic tumors, are there not? A. "Yes."

Q. But you are not in accord with these authors? A. "No, sir."

In reversing the judgment for error in admitting this evidence, the Court says: "It would not have been competent for plaintiff's counsel to produce and read to the jury medical books; much less was it competent to attempt to prove the contents of such books by witnesses testifying solely from memory."

"Medical works are not admissible in evidence, and, when not alluded to in direct examination, cannot be gotten before the jury, over objection, on cross-examination; nor can this be done by indirection in assuming their supposed teachings." *S. v. Blackburn,* 136 Iowa, 747.

The opinion of an expert witness cannot be contradicted by showing on cross-examination what some author has said. *Mitchell v. Leech,* 69 S. C., 413; *Knoll v. State,* 55 Wis., 249.

"When an expert has given an opinion and cited a treatise as his authority, the book cited may be offered in evidence by the adverse party as impeaching testimony. But unless the book is referred to on cross-examination it cannot be used for this purpose. It would be a mere evasion of the general rule under discussion if counsel were allowed on cross-examination to read to the witness portions of such works, and to ask if he concurred in or differed from the opinion there expressed; hence this is not allowed." 3 Jones on Evidence (Blue Book), sec. 579.

Professor Wigmore says: "It has been in some courts held that counsel on cross-examination may, for discrediting purpose, read a professional treatise as opposing the statement of an expert on the stand, or ask whether a contradictory opinion has been laid down by others. But this is generally repudiated." Wigmore on Evidence, vol. 3, sec. 1700, citing *Butler v. R. R.,* 130 N. C., 15.

It will be observed that several of these authorities (*Lynch v. Mfg. Co., Allen v. R. R., Chicago City Railway Co. v. Douglas, S. v. Blackburn*)

meet the position taken by the plaintiff, that although the book may not be introduced in evidence, it is competent on cross-examination to ask for the opinions of experts as contained in books, for the purpose of testing the witness.

The law does not permit that to be done by indirection which cannot be done directly, and the fallacy in the position is in assuming that the unsworn declaration contained in a book is a test of the correctness of the opinion of a witness under oath.

. This evidence elicited from the witness on cross-examination was very important on the issue of damages, as one of the controverted questions on this issue was whether locomotor ataxia could be caused by the injury received in the collision, and the plaintiff had the benefit of the opinions of Strumpell, Osler, and Forsheimer, when under the law he was not entitled to them.

The evidence was not restricted at the time of its introduction, nor in the charge, and if intended as a test of the knowledge of the expert, as now contended, it was before the jury as substantive evidence, and was of a character calculated to influence a finding upon perhaps the most important element in the issue of damages, and that there was some controlling influence is apparent from the fact that the damages assessed at the last trial are about twice as large as the amount awarded upon the first trial.

There must, therefore, be a new trial; and as upon the trial of the issue of damages under the Employers' Liability Act the parties would have the right to introduce all of the evidence bearing on the issues of negligence and contributory negligence, it would serve no good purpose on this record to restrict the new trial to a single issue.

New trial.

CLARK, C. J., concurring in part and dissenting in part: I concur with the opinion of the Court that there have been no errors committed on the first and second issues, but I cannot concur that there should be a new trial on the third issue.

The questions asked Dr. Laughinghouse on cross-examination, *as to* the opinions set down in the text-books as the views of Drs. Strumpell, Osler, and Forsheimer, were not intended to put the views of those physicians in as substantive evidence, but merely to shake the credit to be given the testimony of Dr. Laughinghouse by proving by his own testimony that he differed from the text-books which he had studied.

Rule 27 of this Court prescribes that it shall not "be ground of exception that evidence competent for some purposes, but not for all, is admitted generally, unless the appellant asks at the time of its admission that its purpose shall be restricted." This was not asked by the appellant on this occasion, but its counsel objected generally to the competency

of the testimony. It was competent for the purpose of testing the witness to show that he differed from the text-books which he had studied and from which he derived his professional education. In this view it was entirely competent, and in no wise infringes upon the rule that the testimony of experts cannot be read from the books as substantive testimony. There can be no doubt that the counsel for the plaintiff was using this testimony simply for the purpose of shaking the credit to be given the testimony of the professional expert by showing that he differed from the standard authorities. The jury must have taken the same view. To them the names of Strumpell, Osler, and Forsheimer conveyed no particular weight, and they must have understood merely that the witness on the stand was differing from the views of other physicians whom his profession and the witness himself considered as authority.

It was not necessary that the plaintiff's counsel should make this plainer than they did. Rule 27, just quoted, provides that such evidence, being competent for some purpose (*i. e.*, as impeaching testimony), was properly admitted "unless the appellant asks at the time of its admission that its purpose shall be restricted." This rule was adopted by this Court in consequence of many glaring instances of miscarriage of justice, in that appellants would take advantage of the fact that evidence competent for some purposes might not be competent for others. This Court thereupon adopted the common-sense rule that an appellant should not hereafter obtain a new trial upon such grounds unless at the time of making the objection he should ask that the evidence be restricted by the court to the purpose for which it was competent.

A trial is for the ascertainment of the truth of the matters in controversy, and its only object is to secure justice. In this case the plaintiff was seriously injured, and, he alleges, by the negligence of the defendant company. Two juries after long-drawn-out trials, in which the learning and the ability of numerous counsel on both sides have been brought to bear, have found that these allegations are true. On this appeal this Court has again determined that there was no error as to the verdict on these two issues. It is inconceivable that the verdict on the issue as to damages should have been materially affected by the fact that the views of three eminent physicians contained in the text-books studied by the witness on the stand should have differed from his to the extent that the jury should have accepted their views instead of his. The only effect of the difference would be that the jury would give possibly less weight to his opinion without being aware that the opinion of the other physicians had any especial weight *per se*. It is true that the views of physicians as published in the text-books are not substantive evidence, but the plaintiff's counsel did not offer them as such, and it is solely the

TILGHMAN v. R. R.

defendant's fault that if its counsel thought the testimony would have that effect he did not ask the judge to restrict the testimony to the purpose for which it was competent—of contradicting or testing the witness on the stand and affecting the weight to be given to his testimony.

It is not so important in ruling upon testimony that the judge should always be explicit, especially when not requested by the party objecting, as to the exact bearing of the testimony. The question is not as to a theoretical and precise observance of accurately drawn requirements, but whether substantial justice has been done by a judge and jury who understood the matters laid before them for their decision.

In the English courts, while they have rules as to evidence which are intended to be observed (and when they are not observed the court points out the error on appeal), it is rarely that an English court grants a new trial for an error in the admission or rejection of testimony, except the testimony was rejected and was not only competent, but material. New trials are not there granted for the admission of testimony, nor for any theoretical error even in rejecting testimony.

It seems to me that another trial, a third trial, should not be granted the defendant at great expense and hardship to the plaintiff, who long since was crippled and injured by the negligence of the defendant, as two juries have found, and when the only error alleged is that it was not made sufficiently plain to the jury that the views of certain eminent physicians laid down in the text-books were admitted merely as impeaching evidence and not as substantive evidence. It may well be that the jury would not understand the difference between the two. Certainly the defendant's counsel did not ask that the court should instruct the jury as to the difference, and Rule 27, to prevent just such miscarriage as this, provides that unless such instruction is asked an exception on that account is waived.

As we said in *Wilson v. Mfg. Co.*, 120 N. C., 96 (often cited since, see Anno. Ed.) : "A trial is not a game of skill in which the object is to catch the judge out on first base by an inadvertence or error," and whose result an umpire must rule out unless the rules of the game are in every respect strictly observed. But it is a serious and solemn determination of the rights of the parties, and justice should not be delayed by a controversy as to whether there has been an exact observance of requirements, more or less theoretical, however admirable and logical those rules may be, when the result would not be affected.