### ROTOGRAPH CO. *v.* UNITED STATES (No. 27).[1]

1. PICTORIAL POST CARDS.

    Gelatin prints produced by the lichtdrück process were not dutiable under paragraph 403, tariff act 1897, but under paragragh 400 of that act.—Carter *v.* United States (T. D. 31033), *supra*, p. 64, reaffirmed as to sufficiency of protest.

2. DICTIONARIES AND TREATISES.

    When the language of a revenue law would indicate that certain words had been employed by the Congress because the processes of a particular art were changing processes, dictionaries and treatises may be referred to for the purpose of showing the state of that art.

#### United States Court of Customs Appeals, November 30, 1910.

TRANSFERRED from the United States Circuit Court for Southern District of New York, G. A. 6587 (T. D. 28158).

[Reversed.]

*Comstock & Washburn* (*Geo. T. Puckhafer* on the brief) for appellants.

*D. Frank Lloyd*, Assistant Attorney General (*Thomas J. Doherty* on the brief), for the United States.

#### Before MONTGOMERY, HUNT, SMITH, and BARBER, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise in controversy consists of pictorial post cards assessed for duty at 25 per cent ad valorem, as printed matter not specially provided for under paragraph 403 of the act of 1897, reading:

Books of all kinds, including blank books and pamphlets, and engravings bound or unbound, photographs, etchings, maps, charts, music in books or sheets, and printed matter, all the foregoing not specially provided for in this act, twenty-five per centum ad valorem.

The importer claimed that the merchandise was specifically provided for by paragraph 400, which imposes a duty varying according to the thickness of the paper and other conditions named in the paragraph upon "lithographic prints from stone, zinc, aluminum, or other material, bound or unbound."

---

The articles in question are produced by coating a piece of plate glass with specially prepared gelatin. This gelatin is then exposed beneath a photographic negative intended to be printed. The light penetrating through this photographic negative acts upon the gelatin, dependent upon the density of the different portions of the negative. The result is that the gelatin is hardened in certain portions and is left soft in others. After that it is subjected to a water and acid bath. Wherever the light has failed to harden the gelatin, it has the property of absorbing or retaining the ink and such portions as have been hardened reject the ink. The gelatin is then put in a lithographic press and the prints are made therefrom. The process is chemical printing as distinguished from printing from type or raised surfaces, such as ordinary printing.

On the hearing before the board it was claimed that the protest was insufficient. The board agreed with the Government's contention in this respect, but also considered the merits of the protest, and held that the position of the importer was not tenable. From this decision of the board an appeal was taken to the Circuit Court for the Southern District of New York and the case subsequently transferred to this court.

The protest, so far as it is pertinent, is as follows:

Notice of dissatisfaction is hereby given with and protest is hereby made against your ascertainment and liquidation of duties and your decision assessing duty at 25 per cent ad valorem or other rates or rates on lithographic prints or other merchandise covered by entries below named. The reasons for objection, under the tariff act of July 24, 1897, are as follows:

Said merchandise is not dutiable as assessed. It is otherwise more aptly and specifically provided for. It is covered by and is dutiable under paragraph 400 at the rate or rates therein provided, according to thickness, cutting, size, etc.

The board, in sustaining the objection to the protest, said, in its opinion:

Paragraph 400, upon which appellants rely, is very long. It provided for many different classes of goods and prescribes no less than 11 different rates of duty as applicable thereto. Yet the protests do not mention which of these many rates of duty is claimed nor do they give any description whatever of the merchandise. In other words, they fail utterly to show that the objection taken at the trial was in the mind of the importers when the protest was filed, and they are likewise wholly insufficient to notify the collector of the true nature and character of the objection the importers might have entertained, so as to enable him to rectify any error that may have occurred in the classification of the goods.

We think the question is ruled by the recent decision of this court in Carter *v.* United States, *supra*, p. 64 (T. D. 31033), in which case it was held that—

Where the importer protests against the rate assessed, and at the same time points out provisions under which he claims the article to be dutiable with sufficient clearness so that the collector may by mere computation or examination of the goods determine their classification, he has complied with the statute in all essential respects.

In the present case all that was required to apprise the collector of the precise rate of duty claimed by the importer was an inspection of the postal cards and an examination of their thickness, etc. That case rules the present. See also Buehne Steel Wool Co. v. United States (159 Fed. Rep., 107; T. D. 27536).

The question is then presented whether the goods imported are lithographic prints within the meaning of the tariff law. The testimony of witnesses in the case fails to support the contention of the importer. But it may be said that they were witnesses who were speaking of the lithographic process as originally known and understood. For instance, one of the witnesses was of the opinion that lithography is limited to printing from stone. He was asked:

Q. What do you understand by the word "lithography"?—A. Well, lithography is printing from stone.

Q. And you get that how?—A. Like the word "litho," means stone.

Q. And when you use the word "lithography" you have reference to it in that sense?—A. Yes.

The witnesses for the Government gave similar testimony, but each recognized in the process employed in printing the cards under consideration, namely, the lichtdruck process, or the Albertype process, many of the characteristics of lithography, among which are that it is a surface printing process; that the lithographic press is used as distinguished from the roller press; that the process of printing in the lichtdruck process is similar to that used in the lithographic, in that a dampener is used and water applied, and in the sense that the soft portions of the gelatin attract ink as the fatty surface of the stone attracts ink. The point of difference between the two processes is that in case of the use of a stone the design must be drawn or etched upon the material from which the print is to be made, and the question is whether this distinction, in view of the history of the tariff acts and in view of the knowledge which Congress must be presumed to have had of the development of the art, should be held to differentiate the present products of the lithographic press from those produced by the old method.

The tariff act of 1890 recognized a departure from the original meaning of the word "lithography" by providing for "lithographs printed on zinc as well as stone," the language of the act being, "Lithographic prints from either stone or zinc." This language was continued in the tariff act of 1894, paragraph 308. In 1897, however, in the paragraph in question, 400, the language employed is "lithographic prints from stone, zinc, aluminum, or other material, bound or unbound." It is manifest than Congress was keeping pace with the progress of the art, and we think it may be assumed that the Members of Congress were acquainted with the progress of the art, as evidenced by standard authorities upon the subject, particularly

lexicographers. We find in the Century Dictionary, published before that date, lithography defined as follows:

The art of making a picture, design, or writing upon stone in such a manner that ink-impressions can be taken from the work, and of producing such impressions by a process analogous to ordinary printing. In the first process the stone is prepared by grinding to give it a grained or slightly roughened surface, on which the design is drawn with a lithographic crayon precisely as it is to appear in print, but reversed; or the surface is smoothed, and the design is made with pen or brush in lithographic ink. When the drawing is finished, the stone is etched with dilute nitric acid, and then flooded with nitric-acid and gum-arabic solutions combined. The acid decomposes the soap of the crayon or ink, and leaves the marked surface of the stone in a chemical condition that fits it to absorb fatty inks. The gum water, on the other hand, covers with an adherent film all those parts of the surface of the stone which have been left untouched by the crayon or ink. The stone is then passed on to the printer, who "washes out" the picture with turpentine, after which the image appears faintly defined in white. To print from it an inking roller is now passed over the stone. The wet gummed surface resists the ink and remains clean, while the design takes up the ink and readily gives it back to paper under pressure in the press. * * * The design may be put upon the stone by direct drawing, by transfer from paper or from another stone, by engraving, or by transfer from a photograph. * * * The fourth process is that of transferring a photograph to the stone and is called photolithography (which see).

*Photolithography:* The art of fixing on the surface of a lithographic stone by the agency of the action of light upon bichromated gelatin combined with albumen, and by other manipulations, an image suitable for reproduction in ink by impression in the manner of an ordinary lithograph; also extended to include processes of similar character in which the transfer is not made to stone.

In a work published in 1885 entitled "Color and Color Printing as Applied to Lithography," Chapter XXVI, it is said:

In the Grammar of Lithography we have briefly drawn attention to the Albertype and Heliotype processes, on both of which surfaces of gelatin are employed and printed after the lithographic manner. To a certain extent the gelatin may be said to be a substitute for stone, the printing image being obtained by photography instead of drawing or transferring.

In the Grammar of Lithography, by the same author, it is said:

The art of lithography is based upon a chemical principle—that of the attraction and repulsion of various natural substances, and more especially upon the antagonistic qualities of grease and water, or of those substances which are soluble in water and those soluble in oil.

Reference to works of this character may be had for the purpose of showing the state of the art. See Brown *v.* Piper (91 U. S., 37, 40); Nix *v.* Hedden (149 U. S., 304, 306). In the latter case it was held that the court would take judicial notice of the ordinary meaning of words, and that upon such a question dictionaries are admitted, not as evidence, but as aids to the memory and understanding of the court. It was said by Mr. Justice Swayne, in Brown *v.* Piper (supra):

Courts will take notice of whatever is generally known within the limits of their jurisdiction; and if the judge's memory is at fault he may refresh it by resorting to any means for that purpose which he may deem safe and proper. This extends to such matters of science as are involved in the cases brought before him.

See also Cushman Paper Box Machine Co. v. Goddard (95 Fed. Rep., 664). This right or duty of the court to take cognizance of such works as those presented has peculiar force in the present case, as the fact that Congress legislated with reference to the advanced state of the art is manifest from the language of the very act itself. If "lithoraphy" is confined to the ordinary definition, it is "the art of engraving on stone." See Murray's New English Dictionary, title "Lithograph." But obviously the term "lithographic prints," as defined by this statute, is not so restricted, and in an inquiry as to what is meant resort must be had to publications showing the progress of the art of lithography, of which it must be assumed that Congress had knowledge. So far as this record discloses, unless we apply the words "other material" to the gelatin process, these words have no office to fulfill.

We think it should be held that the postal cards in question come within the terms of this paragraph and are dutiable thereunder. The decision of the Board of General Appraisers is reversed.

De Vries, Judge, having participated in the decision below, did not sit.