UNITED STATES v. MERCK & CO. (No. 1764).[1]

1. EVIDENCE, ADMISSIBILITY—JUDICIAL KNOWLEDGE—RECORDS OF PATENT OFFICE.
   It appearing from the record that the origin of the word "lanolin" was marked by the issuance of letters patent by the Patent Office of the United States for an article therein denominated as "lanolin" or "lanoline," whereby a new term was introduced into the language of the country, and the issue being the meaning of that term, the letters patent were properly admitted in evidence for the purpose of showing its origin and in part its history and development. Furthermore, the board was justified in refreshing the judicial knowledge by resorting to these letters patent as public documents and records.

2. EVIDENCE—JUDICIAL KNOWLEDGE.
   In determining the meaning of the word "lanolin," the board was justified in refreshing the judicial knowledge by resorting to such dictionaries and scientific treatises as under all the circumstances of the case it deemed safe and proper.

[1] T. D. 37288 (33 Treas. Dec., 78).

3. EVIDENCE—PRESUMPTION THAT COMMERCIAL AGREES WITH SCIENTIFIC AND COMMON MEANING—ADEPS LANÆ ANHYDROUS—LANOLIN.

Scientific authorities, dictionaries, and encyclopedias do not class adeps lanæ anhydrous as lanolin. Presumptively commercial usage is the same, and, in the absence of any showing of commercial usage to the contrary, the board's classification of it as "wool grease * * * refined or improved in value or condition," and not as "lanolin," under paragraph 44, tariff act of 1913, is affirmed.

## United States Court of Customs Appeals, May 28, 1917.

APPEAL from Board of United States General Appraisers, G. A. 7952 (T. D. 36613).

[Affirmed.]

*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

*Allan R. Brown* (*Allan R. Brown* and *Charles A. Darius* of counsel) for appellees.

[Oral argument Feb. 8, 1917, by Mr. Hanson and Mr. Brown.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

Paragraph 44 of the tariff act of 1913 reads in part as follows:

44. * * * Wool grease, including that known commercially as degras or brown wool grease, crude and not refined or improved in value or condition, one-fourth cent per pound; refined or improved in value or condition, and not specially provided for in this section, one-half cent per pound; lanolin, 1 cent per pound. * * *

Two varieties of products of wool grease are known, respectively, as "adeps lanæ anhydrous" and "adeps lanæ cum aqua." Both are conceded to fall within the phrase "wool grease * * * refined or improved in value or condition" as used in the aforesaid paragraph. It being conceded that the term "lanolin" as therein used is more specific than the phraseology last referred to, and that the adeps lanæ cum aqua falls and is included therewithin, and dutiable thereunder, the question presented and controverted in this appeal is whether or not the adeps lanæ anhydrous product of wool grease also falls therewithin and is dutiable as "lanolin." The Board of General Appraisers held that it did not so fall and was not so dutiable. The Government appeals. While both products were involved in the decision of the board, the importers, who are appellees here, concede that the adeps lanæ cum aqua is included within the term lanolin and is not, therefore, properly dutiable under the phrase wool grease refined or improved in value or condition. In other words, the Government claims both the products are dutiable as lanolin, whereas the importers admit the adeps lanæ cum aqua to be, but deny that the adeps lanæ anhydrous is so dutiable, claiming that product dutiable as "wool grease * * * refined or improved in value or condition" under the same paragraph. There was no testimony upon this point introduced before the board, their decision being predicated upon the definition of "lanolin" as given in certain

scientific treatises, which it was held by the board conformed with the lexicographic definitions of lanolin. On the other hand, the Government maintains, among other matters urged, that "lanolin" as commonly used and understood includes both these products, and that the board erred (1) in resorting to and (2) in adopting the scientific definitions in the publications in question in order to determine and in determining the issue presented.

At the threshold of the inquiry the Government presents the proposition, generally, that resort to scientific definitions and publications in the determination of tariff issues is error.

In consideration of this question it may be well to observe primarily the distinction which is pointed out by the authorities between *receiving in evidence* scientific publications and the *consultation* of them by the court as aids in refreshing the memory as to scientific facts, truths, and laws.

In this case the error assigned is, first, that the articles patent issued some years since by the Patent Office of the United States for an article therein denominated as "lanolin" or "lanoline" were improperly admitted. It is the view of the court that this was not error.

It appearing from the record that the origin of the word "lanolin" was marked by the issuance of these letters patent, whereby a new term was introduced into the language of the country, the letters patent were, at least, admissible for the purpose of showing the origin and in part the history and development of the term which the court is here called upon to interpret. Furthermore, the rule is universal that a court in order to refresh its memory may resort to public documents and records. The principle is concisely stated in 16 Cyc., 922, as follows:

The judge may resort to or obtain information from any source of knowledge which he feels would be helpful to him, including *public official documents of all kinds*, whether of the State or National Government—such as those in the State or Navy Departments, Census Bureau, or Land Office. Indeed, he may resort to any public document properly authenticated. [Italics ours.] (For citations supporting text see volume and page quoted.)

It is well settled that the records of the executive departments of the Federal Government are public records and within the judicial cognizance of the courts. The rule was applied as to the Department of the Interior, within which is included the Patent Office, from which the letters patent here admitted emanate, in Knight *v.* United States Land Association (142 U. S., 161, 169). See also Gardner *v.* Collector (6 Wall., 73 U. S., 499, 509), Armstrong *v.* United States (13 Wall., 80 U. S., 154), Coffee *v.* Groover (123 U. S., 1, 11), New York Indians *v.* United States (170 U. S., 1, 32), Jones *v.* United States (137 U. S., 202), Duncan *v.* Navassa Phosphate

Co. (137 U. S., 647), Paquete Habana (175 U. S., 677, 712), ex parte Hitz (111 U. S., 766), In re Baiz (135 U. S., 403, 432).

The particular sources of information adverted to by the board were Chemical Technology and Analysis of Oils, Fats, and Waxes (1914), by Lewkowitsch, Encyclopædia Britannica (1911), United States Dispensatory (1907), United States Pharmacopœia (1905), and New and Nonofficial Remedies, published by the American Medical Association (1912). These are either chemical treatises or chemical definitions from standard works. It requires neither argument nor authority to support the fact that chemistry is one of the well-recognized sciences, that treatises upon that subject are scientific treatises, and definitions thereof scientific definitions.

A broad, general rule as to what the court may advert to in order to refresh its mind, as distinguished from what may be introduced in evidence in a case, is set forth in 16 Cyc., 922, part of which was quoted hereinbefore, as follows:

This power of the court is not only valuable in shortening trials of fact, but it is useful to an appellate court by preventing reversals where the evidence on the record fails to establish a result which is in accordance with substantial justice. The judge may resort to or obtain information from *any source of knowledge which he feels* would be helpful to him, including public official documents of all kinds, whether of the State or National Government, such as those in the State or Navy Departments, Census Bureau, or Land Office. Indeed, he may resort to any public document properly authenticated; to *dictionaries, books, periodicals, and public addresses.* He may even inquire of others. On matters of public history he may examine public documents, histories, or other writings of historical data. He may inform himself as to the facts of geography, such as the navigable character of a river, the distance between two points, the location of a given place within the jurisdiction, by resort to histories, geographies, public documents, maps, etc. Where the court is authorized to construe, or to charge the jury concerning the ordinary meaning of words in the vernacular, the judge may resort to *dictionaries, works of history,* or other writings, which while not strictly evidence, but merely serving to bring actual up to judicial knowledge, or aiding, as the Supreme Court of the United States say, "the memory and understanding of the court." [Italics ours.] (For citations supporting text see volume and page quoted).

The sources of information may include matters of public notoriety within the court's memory (United States *v.* Whitridge, 197 U. S., 135), or *matters of science as recorded in scientific works* (Brown et al. *v* Piper, 91 U. S., 37, 42; Hoyt *v.* Russell, 117 U. S., 401, 405), or history and historical works (Hoyt *v.* Russell, supra), or dictionaries (Nix *v.* Hedden, 149 U. S., 304, 307).

Some specific decisions may well be adverted to. Thus in Union Pacific Railway Co. et al. *v.* Yates (79 Fed., 584, 588), relied upon by the Government herein, it is said:

All the authorities agree, we believe, that standard works which deal with the exact sciences, including herein interest and annuity tables, and tables compiled from well-established data showing the average duration of human life, are *receivable in evidence* to establish the facts to which they relate. Schell *v.* Plumb (55 N. Y.,

598), Mills *v.* Catlin (22 Vt., 98), Munshower *v.* State (55 Md., 11), Green *v.* Cornwell (1 City H. Rec., 11). We can perceive no reason why the *truths of exact science* to which all intelligent persons assent, and well-established historical facts, should not *be proven* by the writings of competent authors, and all courts agree that they may be so proven. [Italics ours.]

It will be observed that the court therein was speaking not alone of what the court might resort to judicially but of what might be actually introduced as evidence in the case. So in Jones *v.* United States (137 U. S., 202, 216), Mr. Justice Gray, speaking for the Supreme Court, said:

In the ascertainment of any facts of which they are bound to take judicial notice, as in the decision of matters of law which it is their office to know, the judges *may refresh their memory* and inform their conscience *from such sources as they deem most trustworthy.* (Gresley Eq. Ev., pt. 3, c. 1; Fremont *v.* United States, 17 How., 542, 557; Brown *v.* Piper, 91 U. S., 37, 42; State *v.* Wagner, 61 Maine, 178.) [Italics ours.]

And in Brown et al. *v.* Piper (91 U. S., 37, 42), a case often referred to upon this subject, Mr. Justice Swayne, speaking for the court, said:

Courts will take notice of whatever is generally known within the limits of their jurisdiction; and, if the judge's memory is at fault, he may refresh it by resorting to *any means for that purpose which he may deem safe and proper.* This extends to such *matters of science as are involved* in the cases brought before him. [Italics ours.]

In Kaolatype Engraving Co. *v.* Hoke (30 Fed., 444, 446), Judge Thayer, after reciting certain dictionaries, said:

As the case has been presented, the question really before us is whether we will take *judicial notice of certain processes described in various mechanical dictionaries, encyclopedias, and other publications* produced on the hearing *of the demurrer,* and, by reason of our taking judicial recognizance of such processes, determine that the patent in question does not describe an advance in the art to which it appertains rising to the dignity of an invention. Besides those facts of which courts are bound by law to take judicial notice, they will ordinarily only take notice of facts of universal notoriety—of facts that are so generally understood that they may be regarded as forming part of the common knowledge of every person. Brown *v.* Piper, *supra.* The matters of which we are asked to take judicial cognizance *in this instance,* and thereupon declare the invalidity of this patent, do not strike us as falling within the last category. *They are a class of facts which might more properly be called to our attention on the hearing* (with opportunity to the other side to rebut or *explain*) as tending to show the state of the art to which this patent appertains, and for the purpose of enabling us to determine whether this patent really describes a newly discovered process which called for an exercise of the inventive faculty. [Italics ours.]

The question seems concluded in this court in the case of Rotograph Co. *v.* United States (1 Ct. Cust. Appls., 82, 85; T. D. 31106) wherein the court said:

Reference to works of this character may be had for the purpose of *showing the state of the art.* See Brown *v.* Piper (91 U. S., 37, 40); Nix *v.* Hedden (149 U. S., 304, 306). In the latter case it was held that the court would take judicial notice of the ordinary meaning of words, and upon such a question dictionaries are admitted, not as evidence, but as aids to the memory and understanding of the court. It was said by Mr. Justice Swayne, in Brown *v.* Piper (supra): "Courts will take notice of whatever is generally

known within the limits of their jurisdiction; and if the judge's memory is at fault he may refresh it *by resorting to any means for that purpose which he may deem safe and proper.* This extends to such matters of science as are involved in the cases brought before him." [Italics ours.]

The clearly deducible rule from authorities, therefore, seems to be, that a court is warranted, that the ends of justice may not be defeated, in taking judicial notice of such public records, documents, dictionaries, and scientific treatises which the court, under all the circumstances of the case "may deem safe and proper."

It may be appropriate to remark that this conclusion perfectly accords with the practice of all courts, tribunals, and officials interpreting customs laws since the foundation of the Government and that the adoption of any other rule discards the selected and approved wisdom of both the ages and modern years, which, uniformly, it may be said, in deference to public criticism and rejection and in the interests of acceptance and approval, keeps abreast with the advance in mechanism, science, and the arts, and, in lieu thereof, would probably make such courts, tribunals, and officials controlled in their decisions by the limited knowledge of the interested and too frequently uninformed vendor of the particular merchandise.

Wherefore the court is of the opinion that in this case the board was entirely justified in its examination of the authorities noted and the refreshing of its memory therefrom.

An examination of those authorities we think clearly draws a distinction between adeps lanæ anhydrous and adeps lanæ cum aqua in that they class and admit the latter and not the former as lanolin. The question then presented is whether or not this scientific definition or classification of the term accords with or is contrary to its common acceptation which as spoken is set forth in its various lexicographic definitions. Of course, the rule is well established that if the latter were the case the common acceptation must prevail in import customs revenue adjudication.

Thus, in Lutz *v.* Magone (153 U. S., 105), the court said:

It is entirely well settled, however, that in the interpretation of the revenue laws words *are to be taken in their commonly received and popular sense,* or according to their commercial designation, if that differs from the ordinary understanding of the word. Customs officers are presumed to be acquainted with the ordinary meaning of words, and may also be presumed to have some familiarity with trade designations and the customs of dealers. *They are not, however, supposed to be chemists, scientists, or professional men, nor to be conversant with the terms of particular arts.* [Italics ours.]

So the Supreme Court, in Two Hundred Chests of Tea (9 Wheat., 22 U. S., 430, 438), said:

Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic.

See also Merchants' Despatch Transportation Co. *v.* United States (121 Fed., 443), wherein the court applied the common acceptation of the term "albumen" as against the technical *chemical* understanding thereof; Nordlinger *v.* United States (127 Fed., 683; T. D. 24976); United States *v.* Buffalo Natural Gas Fuel Co. (78 Fed., 110).

The common or general acceptation of the term is, of course, evidenced by the lexicographic uses of the word.

While some of the lexicographers, notably in the New Standard Dictionary, Webster's International Dictionary, and the Century Dictionary and Cyclopedia, adopt definitions of "lanolin" broad enough to include articles other than adeps lanæ cum aqua, that does not appear to be the *commonly* accepted use of the term as shown by other authorities of common speech. We quote:

The New International Encyclopedia:

*Lanolin* * * * or adeps lanæ hydrosus.—The purified fat of the wool of the sheep, mixed with not more than 30 per cent of water. It is a white fatty substance, insoluble in water, not subject to decomposition, and not irritating to the skin. It is used as an emollient, and also as a base for various ointments.

Encyclopædia Britannica (eleventh edition):

*Lanolin.*—* * * The commercial name of the preparation styled adeps lanæ hydrosus in the British Pharmacopœia, and which consists of 7 ounces of neutral wool-fat (adeps lanæ) mixed with 3 fluid ounces of water.

Wherefore it is obvious that the term has no *commonly* understood meaning contrary to its scientific acceptation as shown by this record.

*Affirmed.*

### CONCURRING OPINION.

BARBER, Judge: The record in this case is barren of parol testimony as to the methods employed in the production of the merchandise. The letters patent which were offered in evidence, however, clearly tend to show that "lanolin," when first introduced into commerce, was obtained by separating wool grease from the waste matter and dirt in which it was found by means of both chemical and mechanical processes. Anhydrous wool grease was one product of these processes. Further treatment and purification resulted in the taking up by the wool grease of a certain amount of water, the final product being a new article said to be a perfectly white, neutral, colorless unguent without odor, to which the name "lanolin" was given by the inventor of the process. It manifestly took this name in commerce.

The definitions of "lanolin" in the dictionaries, as appears, are broad enough in most, if not all instances, to cover both the anhydrous and the hydrous products, but as stated by the board— ·

The dictionary definitions cited by the Government, which simply define lanolin as being a compound of cholestrin and fatty matter derived from sheep's wool without

mentioning the intervening product, adeps lanae anhydrous, do not make against or minimize the effect of their separate definition as two distinct substances in the authorities above quoted.

The real question is, in what sense is it to be held that Congress *used* the word "lanolin" in paragraph 44, having in mind that it clearly provided therein for three classes of merchandise, (1) wool grease, crude and not refined or improved in value or condition; (2) refined or improved in value or condition, and not specially provided for; (3) lanolin.

It must be presumed that Congress had in mind that there were such three classes of the commodity. The authorities, in conjunction with the patent, show that the hydrous wool grease is "lanolin," and that before it is obtained the less refined anhydrous product appears. It seems entirely reasonable to believe that Congress intended that the anhydrous product should come within the second classification provided for in the paragraph. In other words, force and application must be given the apparent intent of Congress. This is accomplished by the assessment of the anhydrous wool grease, which really is wool grease that has been refined or improved in value or condition, under class 2 of the paragraph and of the hydrous product as "lanolin" under class 3.

In Koechl & Co. *v.* United States (3 Ct. Cust. Appls., 316; T. D. 32619), decided in 1912, the subject of wool grease was considered. There was then no separate tariff provision for "lanolin." Paragraph 290 of the act of 1909, then under review, contained a provision for wool grease of two kinds only, one the crude article and the other that which had been refined or improved in condition or value. Both anhydrous adeps lanæ and the hydrous article were referred to by Smith, Judge, in writing the opinion. The merchandise had been classified as a medicinal preparation and was claimed to be dutiable under the provision for refined wool grease. The various decisions on the subject were reviewed, and the names, uses, and manner of production of the different kinds of wool greases discussed.

It was held that both the anhydrous and the hydrous products were dutiable as wool grease refined or improved in value or condition, there then being no provision for "lanolin."

Now, in the act of 1913 Congress took just the action which would be expected if it desired to impose the highest duty upon the most refined product by declaring that "lanolin," the article which is the most refined, shall take the highest rate of duty.

I would therefore base the judgment of affirmance upon the ground that whether or not "lanolin" as defined in the dictionaries includes both the anhydrous and the hydrous wool greases, Congress, in view of the whole history of the subject, manifestly intended it to apply to the hydrous product.