(C. D. 1326)

WALTER STRASSBURGER & CO., INC., ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 10, 1951)

*Sharretts, Hillis, Mansbach & Paley* (*Howard C. Carter, Louis J. Paley, Edward P. Sharretts,* and *Maxwell Palmer* of counsel); *Hugo E. Rogers; Green & Yanoff* (*Leo Yanoff* of counsel); and *Brooks & Brooks* (*Frederick W. Brooks* of counsel), associate counsel; for the plaintiffs.

*David N. Edelstein,* Assistant Attorney General (*Richard E. FitzGibbon* and *Richard H. Welsh,* special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: This case involves the question of the proper classification of certain woven silk fabrics which were imported from Japan.

At the hearing held on January 11, 1949, three protests were consolidated for the purpose of trial. Thereafter, on January 23, 1950, when the case was again called for hearing, nine other protests were consolidated with the original three protests for the purpose of trial. During the hearing held on March 6, 1950, counsel for the plaintiffs renewed his motion, previously made, to consolidate some 350 other protests for the purpose of decision, and this motion was granted by the court. On April 28, 1950, counsel for the plaintiffs filed a motion to sever from said consolidation protests 153630–K, 150764–K, and 148685–K, and good cause therefor having been shown, the court granted said motion. The protests now before us for consideration are listed in schedule "A," hereto attached and made a part hereof.

As to the classification of the merchandise covered by said protests, the collector makes two reports, as follows:

(1) Woven fabrics in the piece, wholly or in chief value of silk, n. s. p. f., or as woven fabrics in the piece, with fibers wholly of silk, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, unbleached, etc., at 55% under Paragraph 1205 of the Tariff Act of 1930.

(2) Woven fabrics in the piece, not bleached, dyed, colored or printed at 55% under Paragraph 1205 of the Tariff Act of 1930.

Paragraph 1205 of the Tariff Act of 1930, under which classification was made, reads as follows:

PAR. 1205. Woven fabrics in the piece, wholly or in chief value of silk, not specially provided for, 55 per centum ad valorem; woven fabrics in the piece, not exceeding thirty inches in width, whether woven with fast or split edges, wholly or in chief value of silk, including umbrella silk or Gloria cloth, 60 per centum ad valorem; any of the foregoing, if Jacquard-figured, 65 per centum ad valorem.

Said paragraph 1205, as modified by the French Trade Agreement, T. D. 48316, under which claim is made by the plaintiffs, reads as follows:

Woven fabrics in the piece, with fibers wholly of silk, bleached, dyed, colored, or printed, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, 45% ad val.

Said paragraph 1205, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, under which claim is also made by the plaintiffs, reads as follows:

Woven fabrics in the piece, the fibers of which are wholly of silk, bleached, printed, dyed, or colored, whether or not exceeding thirty inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured; all the foregoing valued at more than $5.50 per pound, 25% ad val.

As to the merchandise covered by some of the protests before us, the collector forwarded No. 1 report, and as to the merchandise covered by the other protests, he forwarded No. 2 report, set out above. However, the collector makes it abundantly clear that he actually

classified the merchandise under paragraph 1205 of the Tariff Act of 1930, rather than under said paragraph 1205, as modified by some trade agreement. This is further evidenced by the fact that each of the protests before us is filed against the action of the collector in assessing duty upon the merchandise at the rate of 55 per centum ad valorem under paragraph 1205 of the Tariff Act of 1930.

The record in this case is quite voluminous, consisting of the testimony of 91 witnesses, 77 of whom testified for the plaintiff and 14 for the defendant, and 86 exhibits. We shall, therefore, not attempt any detailed discussion of the testimony and exhibits, but shall refer to the same when appropriate and necessary during our discussion of the case. However, all of the testimony and exhibits, as well as the briefs of counsel, have received our careful examination, inspection, and consideration.

During the pretrial of this case on January 5, 1950, counsel for the defendant made the following statement:

Mr. FitzGibbon: May I state at this time that the Government agrees that the only issue before the Court is whether or not the merchandise, the subject of the importations, is bleached or unbleached.

At the same hearing on the same date, the following took place:

Judge Rao: The first item is whether or not the Government will concede that the fabric in suit is made of fibers composed wholly of silk.

Mr. FitzGibbon: The Government will concede that the merchandise before the Court and in suit is made of fibers composed wholly of silk.

Judge Rao: Will the Government concede that the fabric in suit is valued at more than $5.50 per pound?

Mr. FitzGibbon: The Government will concede that the fabric, subject of the action and in suit, is valued at more than $5.50 per pound.

Counsel for the plaintiff, in his brief filed herein, states the issue as follows:

Counsel have agreed that the only issue before the court is whether or not this merchandise is bleached. (R. 34).

Counsel for the defendant, however, states the issue as follows:

The issue is one of fact. In the original three protests it is limited to whether or not the silk goods are bleached, but in all the additional protests the plaintiff must also prove that the goods are wholly of silk fibers and are valued at more than $5.50 per pound.

During the hearing held on January 24, 1950, after counsel for the plaintiffs had offered and there had been received in evidence a number of samples as representative of the merchandise covered by protests other than the three protests consolidated at the hearing on January 11, 1949, and while there was pending before the court a motion of counsel for the plaintiffs to consolidate some 350 other protests with the original three, counsel for the defendant made the following statement:

MR. FITZGIBBON: ' May it please the Court, I find myself in a position now in which I must withdraw two concessions that the Government made in this case. You will recall that on January 5th we had a pre-trial conference in this court room. At that time I was asked to concede that the merchandise before the Court was made of fibers composed wholly of silk, and the Government conceded it. At that time there were three samples in evidence. I was then asked to concede that the merchandise the subject of the suit was valued at more than five dollars and fifty-cents a pound; the Government conceded it. At that time those three samples were the only ones before the Court. The plaintiff has now introduced several more samples. I have never seen them before yesterday. My examiner has not seen those samples. My witnesses have not seen those samples. Therefore, at this time I must withdraw those two concessions.

JUDGE RAO: Concession affecting the three articles in evidence, or the concession affecting the others?

MR. FITZGIBBON: Only affecting the others. As to Exhibits 1, 2 and 3, the concession still stands.

By the foregoing it is made clear that as to the three protests which were originally consolidated, the only burden the plaintiffs had was to establish that the merchandise covered thereby was bleached. However, as to the merchandise covered by all the other protests, the concession of defendant as to the value per pound and that the merchandise was composed of fibers wholly of silk, having been withdrawn, the plaintiffs had the burden of establishing not only that the merchandise was bleached, but also that it was composed of fibers wholly of silk and valued at more than $5.50 per pound. It thus appears that the issue in this case was correctly stated by counsel for the defendant, and upon this theory the case was tried and submitted.

With reference to the exhibits before us, counsel for the defendant agrees that exhibits 7 to 10, inclusive, and 13 to 22, inclusive, are samples of silk piece goods and "represent the silk goods in its condition as imported." As to exhibits 1, 2, and 3, counsel for the defendant states he "believes that they should be excluded from consideration as representative of the imported goods, and respectfully directs the Court's attention to the testimony of the witnesses regarding them."

We have given careful consideration to the testimony of the witnesses regarding these samples, as to how they were taken from the imported merchandise and their custody until produced in court and offered in evidence, as well as the argument of counsel for the defendant relative thereto, and we find that the contention of counsel for the defendant is without merit. All of the samples appear to be *bona fide* samples of the imported merchandise and have been properly accounted for from the time they were imported until they were offered and received in evidence.

As to the processes to which the imported merchandise had been subjected in Japan, counsel for the plaintiffs offered the testimony of

a Japanese witness, Seizaburo Kurokawa. This witness is president of the Fukui Scouring & Converting Co., Ltd., of Japan, and has been engaged in the processing and finishing of silk fabrics in Japan for more than 40 years, and was otherwise well qualified to state the processes to which this silk fabric is subjected prior to exportation from Japan. He described the process to which collective exhibit 8 had been subjected, substantially as follows:

I will give one process after another, one by one. First we accept the piece from the mill where the pieces are woven. Then they check up the length of the piece they have accepted. Then they fold the piece within approximately one yard long. This is a preparatory process in order to facilitate the further process. The next process is so-called desizing, which means to immerse a piece in the used solution of the scouring, which I will explain later.

The witness then explained that this piece is left in the scouring solution overnight at a temperature of from 70 to 80 degrees centigrade.

The solution consists of soap, 6 per cent of the weight of the piece to be immersed; silicate of soda, 3 per cent; soda ash, 2.5 per cent; monogen, 0.5 per cent; hydrosulphite, 0.5 per cent.

That is the chemicals and its per cent. The total volume of the water or solution is kept 25 to 30 times as much as the weight of the fabric to be immersed. The next step is to rinse the piece in clear water for about 20 minutes, 35 degrees centigrade. The piece is then immersed in a chemical solution, with chemicals as above set out, about one and one-half hours with a temperature of from 90 to 100 degrees centigrade, and the solution being 25 to 30 times the weight of the piece immersed. The temperature is maintained at from 98 to 100 degrees centigrade. The fabric is then rinsed in water, 35 degrees centigrade, without any chemicals, for about ten minutes. All ingredients except the hydrosulphite are put into the solution before the fabric is immersed, and the hydrosulphite is added about one hour before the end of the process. The next step is the second scouring, or finishing scouring. The solution for this consists of soap, 6 per cent; silicate of soda, 3 per cent; monogen, 0.5 per cent; bluing material, two one-millionth per cent. That is the weight of two one-millionth of the weight of the fabric. The temperature of the solution is maintained at about 98 to 100 degrees centigrade, and the fabric is immersed for about one and one-half hours. The fabric is then rinsed in water at about 35 degrees centigrade for 20 minutes. The moisture is then taken out by centrifugal extraction and the fabrics put on a finishing calendar and dried.

The witness further testified without contradiction that it is the universal trade practice in Japan to scour and finish silk fabrics in a uniform manner; that sodium hydrosulphite is always used in the scouring process in Japan; that the purpose of the scouring process is to take off the gum; to take off sizing material; to take off fugitive tints; to remove the natural color from the raw silk; and to remove any other foreign matter. The witness also testified that the involved merchandise is bleached, not only because of the process used but also based upon a comparison with other exhibits in evidence.

There is much evidence in this record as to other processes to which

these silk fabrics were subjected in Japan. The ingredients used in these other processes varied slightly from the ingredients used in the process set out above. In processing fabrics of 18 and 20 momme weight, peroxide of hydrogen is always used. However, in weighing this evidence, we have given consideration to all the ingredients used in the different processes, as well as to the weight of the fabric being processed.

Mr. Tadanao Mitsui, another Japanese witness called by counsel for the plaintiffs, stated that he is expert chief of the Dyeing and Finishing Section of the National Textile Research Institute, this being the only national Japanese Government institute handling technical questions of bleaching, dyeing, and finishing in order to improve the textile industry of Japan, particularly with respect to export silk fabrics. He also stated that he was technical supervisor for the Japan Export Silk Fabrics Scourers Association, and a member of the Screening Committee for Licensing of Scourers. He further stated that he had visited and inspected 5 of the 7 scouring mills which scoured silk fabrics for export in 1946 and visited and inspected 11 out of the 13 mills which scoured silk fabrics for export during 1947; that he knew the processes used in all the mills in Japan; that the processes in all the scouring mills were the same; and that the least amount of hydrosulphite used in these processes was 0.5 percent of the weight of the fabric.

The testimony of Mr. Mitsui, as to the processes to which the involved merchandise was subjected and the chemicals used in such processes, was substantially the same as the testimony given by the previous witness, Mr. Kurokawa, hereinbefore set out.

Counsel for the plaintiffs also called another Japanese witness, Mr. Hiroshi Shiga, who stated that he was silk advisor and consultant to the Economic and Scientific Section for the Supreme Commander for the Allied Powers, otherwise known as SCAP; that he visited and inspected most all of the mills which scoured silk fabrics in 1946 and 7 or 8 out of the 13 which scoured silk fabrics in 1947; that the same process was used in all of the mills he visited, and that all of the scouring plants used hydrosulphite.

Mr. Robert A. Hickerson, chief of silk for the Supreme Commander for the Allied Powers, was called as one of plaintiffs' principal witnesses. He testified that he has held this position for the entire period covered by the present importations; that he supervises the scouring, bleaching, and finishing of all silk fabrics throughout Japan; that he visited and inspected all of the scouring mills in Japan; that he issued all orders and directives relating to the scouring of silk fabrics; that all of the plants in Japan which scour silk fabrics for exportation use a standard process, which includes the use of a bleaching agent, either sodium hydrosulphite or hydrogen peroxide, or both;

that a sufficient amount of chemicals was made available to the scourers of silk fabrics for export to enable the scourers to process the silk fabrics in the prescribed manner; that he supervises the Japanese Government Inspection Houses which inspect all the silk fabrics "to see that they are properly bleached," and that the involved merchandise is bleached.

Mr. Hickerson also testified as to the fibers of the involved merchandise being wholly of silk, as follows:

Q. Do you know of your own knowledge whether or not Japanese Silk Habutae and Japanese Silk Crepe for export are composed of fibers wholly of silk?—A. The Japanese are directed that fabrics exported as silk fabrics, are to be of pure silk. In my experience, I have never come across an infraction of that regulation.

Q. Have you ever made any investigation to determine whether or not that regulation was being observed?—A. I certainly have, yes, sir. At times, even after the cases have been sealed, the wooden cases have been sealed, and ready for export to the dock, I have at times called the Textile Bureau in my office, asking for their experts to be sent to my office and, without notice, taken a military car and drove to the actual warehouses on the docks and opened cases, demanding to see the fabrics, and taking swatches or samples for analyzing at a later time. That is to determine pure silk.

In addition to the above testimony, counsel for the plaintiffs offered the testimony of some 50 witnesses, who were either importers or purchasers of silk fabrics from Japan, and who testified that all of the silk fabrics imported or purchased by them during the period covered by the instant protests were used in the condition imported or purchased, without any additional processing of any kind, and that these silk fabrics were all white in color.

Five witnesses who are connected with establishments which print silk fabrics testified that the involved merchandise in its imported condition was suitable for printing without further processing, was actually printed and used without further processing, and that satisfactory results could not have been obtained if the involved silk fabrics had not been bleached.

Counsel for the plaintiffs also offered the testimony of three expert chemical witnesses, each of whom was well qualified in his field, and each of whom, when asked the hypothetical question based upon the processing and chemicals used in such processing hereinbefore set out, stated as his opinion that silk fabrics subjected to such processing and chemicals would be bleached silk fabrics. To rebut this chemical testimony, counsel for the defendant offered the testimony of two expert chemical witnesses who stated in answer to hypothetical questions that in their opinion the involved silk fabrics were not bleached. The plaintiff then called three additional expert chemical witnesses, and each of them gave as his opinion, based upon hypothetical questions, that the involved merchandise is bleached.

The plaintiffs also offered the testimony of witness John Learned, who is associated with Cheney Bros., which organization has been in

the business of weaving, scouring, and finishing silk fabrics in the United States for over 100 years. This witness described the printing of silk fabrics imported by one of the protestants herein and stated that these fabrics were handled in exactly the same manner as subsequent importations that have the stamp of the Japanese Inspection House containing the word "Bleached," and which are now being classified as bleached fabrics.

The defendant appears to rely on the testimony of the Government examiner of merchandise, Mr. David Fineman, as one of its principal witnesses. It is not necessary to discuss the testimony of this witness in detail, because on cross-examination he admitted that plaintiff's exhibits 1, 2, and 3 were bleached, or were of sufficient whiteness to be passed by him as bleached.

Nothing here said should be construed as a criticism of or reflection upon the appraiser of merchandise or his staff. So far as this record shows, the appraiser of merchandise and his entire staff have been cooperative and efficient in the handling of the entries now before the court.

We are in full accord with the following statement quoted from the brief of counsel for the plaintiffs:

It is well established that the common meaning of a term used in the Tariff Act shall be determinative of the meaning of that term unless a commercial designation, different from the common meaning, has been clearly shown. *Two Hundred Chests of Tea*, 22 U. S. 430; *Lutz* v. *Magone*, 153 U. S. 105; *Meyer & Lange* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436; *United States* v. *Merck & Co.*, 8 Ct. Cust. Appls. 171, T. D. 37288; *Hummel Chemical Co.* v. *United States*, 29 C. C. P. A. (Customs) 178, C. A. D. 189.

No attempt was made by either side to prove a commercial designation. Therefore the common meaning controls and is always a question of law for the court. *United States* v. *Florea & Co., Inc.*, 25 C. C. P. A. (Customs) 292, T. D. 49396; *United States* v. *Shalom & Co.*, 33 C. C. P. A. (Customs) 29, C. A. D. 311; *United States* v. *North American Mercantile Co.*, 17 C. C. P. A. (Customs) 378, T. D. 43820; *United States* v. *Ben Felsenthal & Co.*, 16 Ct. Cust. Appls. 15. T. D. 42713.

The New International Encyclopaedia defines "bleaching" as follows:

The art of removing coloring matters from animal and vegetable substances, leaving the material uninjured but of a light or white color, so that, as in the case of fabrics, they may be readily dyed to some desired shade.

It is contended by counsel for the defendant that hydrosulphite is not a bleaching agent, and evidence was offered in an effort to establish this as a fact. Webster's New International Dictionary defines "hydrosulphite" as follows:

*Chem.* A salt of hydrosulphurous acid; a hyposulphite. Specif., sodium hyposulphite, used as a reducing and bleaching agent.

The contention is also made that degumming of silk is not a bleaching process because degumming does not remove any of the natural

color of the silk. In Thorpe's Dictionary of Applied Chemistry, volume 2, p. 18, the following appears:

Silk bleaching.—The colouring matters of raw silk are chiefly in the gum, and after complete degumming the fiber is nearly white.

In *Armand Schwab & Co., Inc.* v. *United States*, 32 C. C. P. A. (Customs) 129, C. A. D. 296, which case dealt with the question of whether or not certain imported hats were bleached, we find the following:

The evidence is all to the effect that the articles are lightened in color by reason of the process, and therefore the principal question to be decided here is whether bleaching means decolorizing to substantial whiteness or whether the articles are bleached because color has been taken from them to a lesser degree.

    \*     \*     \*     \*     \*     \*     \*

There can be no question but that the hats were subjected to the action of bleaching agents. They were not bleached white, it is true, but the colors in the straw which were present before the hats were processed were removed. There is no degree of bleaching set out in the paragraph, and therefore the removal of color to any substantial degree must be considered as coming within the common meaning of the term "bleached."

Based upon the uncontradicted evidence in this case, there can be no question but that the silk fabrics in question were subjected to the action of bleaching agents prior to importation. While it may be true that these silk fabrics were not bleached pure white, yet it is definitely established that the colors in these silk fabrics, which were present before the silk fabrics were processed, were removed. There is no degree of bleaching set out in the two trade agreements here involved, and therefore the removal of color to any substantial degree must be considered as coming within the common meaning of the term "bleached."

Counsel for the defendant contends that the hydrosulphite used:

\*   \*   \*   in the scouring solution of silk was not as a bleaching agent to whiten the silk but merely as a reducing agent to destroy the dye which had been put on the silk in the weaving process  \*   \*   \*.

This contention finds a complete answer in the following quotation from the *Armand Schwab* case, *supra*:

It appears that the straw of which the hats are made is manipulated entirely by hand until the hats are completed. The work of forming the straw into the articles is done by peasants in Tuscany. The straw in the hats is usually of different ages, the older straw being darkened and spotted, and the hats become dirty and stained in the making.

After they were formed, in order to take away the dirt and spots the articles are subjected to a process of being washed with potash, and when half dry are placed in a sulfur vapor. They are then washed with bicarbonate of soda and while still damp are again placed in sulfur vapor. The alkaline substance remaining in the hats after the washing is removed, it is said, by neutralization with "Sale di Acetosella" which was testified to be oxalic acid. The foregoing process is repeated until a desired uniformity of color is obtained in the article, in this case a so-called natural leghorn color.

There is no dispute as to the treatment given the hats. Neither does appellant contend that the hats are not lightened in color by reason of the treatment. Of course this necessarily follows because not only is the dirt removed but also the dark spots and dark colors present in the straw.

In view of the fact that the coloring matters in raw silk are chiefly in the gum, and since it is undisputed herein that the imported silk fabrics were degummed in the scouring processes, the contention that these fabrics are not lightened in color by the scouring processes is without merit. Of course, this necessarily follows because not only is the gum removed but also the dye which had been put on the silk in the weaving process.

In *United States* v. *Armand Schwab & Co.*, 30 C. C. P. A. (Customs) 72, C. A. D. 218, our appellate court pointed out that articles which have been advanced in condition for their intended use by a bleaching process were intended by the Congress to be classified as bleached articles. We quote the following from that case:

\* \* \* We do not wish to be understood as holding, however, that hats which have been advanced in condition for their intended use by a bleaching process were not intended by the Congress to be included within paragraph 1504 (b) (2).

\* \* \* \* \* \* \*

\* \* \* The court found from the evidence of record that the washing process to which the hats had been subjected in China did not eliminate any of the steps in the bleaching process to which it was necessary to subject the hats in the United States, and, accordingly, held that the hats had not been "bleached" within the meaning of that term as used in paragraph 1504 (b) (2).

\* \* \* \* \* \* \*

We are in agreement with the conclusion reached by the trial court, so far as it held that the involved hats are not "bleached" within the meaning of that term as used in paragraph 1504 (b) (2). We think it has been clearly established by the evidence of record that, although there are degrees of bleaching, the washing process to which the involved hats were subjected in China, whether or not the soap used contained bleaching chemicals, did not eliminate any of the steps of the bleaching process, and did not contribute in any way, except to remove a considerable portion of the filth from the hats, to any required degree of bleaching of the hats in the United States.

The complete record in this case, considered in the light of the argument of the respective counsel and the authorities cited in support of their contentions, requires a holding that all of the merchandise covered by the protests listed in said schedule "A" was bleached prior to being imported into the United States, within the meaning of that term as used in paragraph 1205 of the Tariff Act of 1930, as modified by the trade agreement with France, T. D. 48316, and by the General Agreement on Tariffs and Trade, T. D. 51802. It is therefore clear that such merchandise is entitled to the reduced rates of duty, as alleged by the plaintiffs, provided the record also establishes that the merchandise is composed of fibers wholly of silk, and that it is valued at more than $5.50 per pound.

As to the question of whether or not the fibers of the involved fabrics are wholly of silk, attention is invited to the testimony of witness Hickerson, heretofore set out. This testimony stands uncontradicted and without being weakened in any manner by cross-examination. Under the circumstances, the testimony of witness Hickerson, who controlled and supervised every detail of the silk industry in Japan, is certainly sufficient to establish *prima facie* that the fibers of the involved fabrics are wholly of silk, and to shift to the defendant the duty of meeting or overcoming such evidence. This the defendant did not do.

In *United States* v. *Edson Keith & Co.*, 5 Ct. Cust. Appls. 82, T. D. 34128, our appellate court had before it a similar state of facts. It was there held:

The burden of proof—that is to say, the obligation imposed by law on a litigant of establishing a fact by evidence—never shifts; but the duty of meeting or overcoming evidence in favor of or against any given contention may shift from one side to the other during the progress of the trial, according as the nature and weight of the proofs tend to support or controvert the fact or facts, the ascertainment of of which is necessary for the proper judicial determination of the case. Central Bridge Corporation *v.* Butler (2 Gray, 68 Mass. 130–132); Scott *v.* Wood, (81 Cal., 398, 400–402).

With this principle laid down, the question in the present controversy, as we see it, is not whether the importers were charged with the burden of proof, but whether they met their obligations by introducing credible, material, and competent evidence which showed, at least *prima facie*, that the collector's classification was incorrect and that the goods were dutiable under the paragraph claimed in the protest. If they did, then at the very least it was incumbent on the Government to offset that evidence by proof of equal weight tending either to sustain the collector's action or to prove that the goods were not dutiable under the paragraph claimed in the protest. The importers were not bound to make out their case to a moral certainty and beyond a reasonable doubt. To put the Government to its proofs, it was sufficient for the importers to show *prima facie* that their classification was correct and that the collector's classification was wrong, and once that was done the burden of proceeding shifted to the Government—not because the burden of proof had shifted, but because *prima facie* the importers had sustained that burden and proved their case by a preponderance of evidence. McKelvey on Evidence (2d ed., p. 66 *et seq.*); Powers *v.* Russell (13 Pick., Mass., 69, 76–77).

Coming now to the question of whether or not the record establishes that the involved silk fabrics are valued at more than $5.50 per pound, as specified in both the trade agreements, hereinbefore set out, counsel for the plaintiffs has offered in evidence as exhibits 41, 42, 43, and 44, the collector's letters transmitting to this court protests 143437–K, 143438–K, 143439–K, and 141907–K, respectively. Counsel for the plaintiffs also offered and there were received in evidence the collector's letter transmitting each of the 126 protests to this court listed in exhibit 45. Each of the collector's letters in the protests set out above was made and filed within 90 days after the date of filing the respective protests and is therefore a part of the official record before us in each

of those protests. *Raphael Glass Co. and F. P. Dow Co. (Inc.)* v. *United States*, 20 C. C. P. A. (Customs) 291, T. D. 46079; *United States* v. *H. W. Robinson & Co.*, 20 C. C. P. A. (Customs) 222, T. D. 46036; *Bonwit Teller & Co.* v. *United States*, 19 C. C. P. A. (Customs) 238, T. D. 45339; *Bonwit Teller & Co.* v. *United States*, 19 C. C. P. A. (Customs) 348, T. D. 45500; *Tower Manufacturing & Novelty Co.* v. *United States*, 6 Ct. Cust. Appls. 267, T. D. 35478; and *National Hat Pin Co.* v. *United States*, 5 Ct. Cust. Appls. 435, T. D. 34971.

The pertinent part of the collector's letter transmitting protest No. 143437–K, and which is typical of the other letters, reads as follows:

The appraiser's description of the merchandise, made in accordance with section 500 (a), Tariff Act of 1930, and Sections 14.2 and 14.3 of the Customs Regulations of 1943, and Section 14.2 of the Customs Manual of 1943, was accepted and adopted by this office in liquidation, and the merchandise was accordingly classified as—

Woven fabrics in the piece, wholly or in chief value of silk, n. s. p. f., or as woven fabrics in the piece, with fibers wholly of silk, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, unbleached, etc. at 55% under Paragraph 1205 of the Tariff Act of 1930.

Counsel for the plaintiffs also offered in evidence a chart entitled "Table of Momme Grades of Japanese Habutai with Equivalent Weights in Ounces and Grammes," which was received in evidence as exhibit 46.

The examiner of silk fabrics at the port of New York, Mr. Fineman, who examined all or substantially all the silk fabrics before the court, also testified that at the time of examination of the silk fabrics, he compared the merchandise with its description on the invoice and verified the momme weight, the quantity, the width, and the value per yard, and indicated his agreement therewith by placing check marks on the invoices. He also testified that on the basis of those factors, it is merely a matter of computation to determine the value per pound of the involved merchandise.

There was also received in evidence as exhibit 48, computations made by counsel for the plaintiffs covering each entry in each of the protests before the court, other than those listed in said exhibit 45. Counsel for the plaintiffs, under whose supervision exhibit 48 was prepared, gave positive and uncontradicted testimony as to the manner in which exhibit 48 was prepared and a detailed statement as to how the values therein set out were arrived at.

Counsel for the defendant insists that the value per pound of the silk fabric shown in exhibit 48 does not represent the correct and true value per pound for the reason that in making the computations therein the net weights, instead of the gross weights, of the silk fabrics were used to determine the value per pound. He cites, as sup-

porting this contention, the case of *Whittaker, Clark & Daniels, Inc.* v. *United States*, 34 C. C. P. A. (Customs) 164, C. A. D. 360.

The *Whittaker* case is distinguishable from the instant case upon the facts. In the instant case, the appraiser ascertained and appraised the unit value of the silk fabrics *per se* to be so many cents per yard (section 501, Tariff Act of 1930), to which he added, not the weight, but the cost of all containers and coverings, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States (section 402, Tariff Act of 1930). Neither the weight of the merchandise *per se* nor the weight of the packing was a factor in his appraisement, although the regulations may require that they be stated on the invoices for administrative purposes. The value ascertained by the appraiser in yards, plus the cost of the packing aforesaid, became the final appraised value. In this situation, the translation of the value per yard into the value per pound for the purpose of ascertainment of the duties payable must depend upon the proof of the weight of the merchandise *per se* as adduced by the parties upon the trial.

In compliance with section 402 of the Tariff Act of 1930, the appraiser in the instant case merely added the cost of the packing, not the weight thereof, to the value per yard of the involved merchandise. In this case, the appraiser did not add to the value per yard, which he found for the silk fabric, the weight of the packing, including strings, paper, canvas bags, and wooden cases. What, may we ask, would the result be if one should attempt to add to the value per yard of the involved silk fabric, as found by the appraiser, the weight of the packing? We might add the weight of the packing to the weight of imported merchandise, if it were bought and sold in the unit of weight, but where, as here, the merchandise is bought and sold in the unit of yards, it is at once apparent that the weight of the packing could not be added to the value per yard found by the appraiser.

Since it has been shown that it was impossible for the appraiser to have added the weight of the packing of the involved silk fabric to the value per yard which he found for the merchandise, it is abundantly clear that the appraiser did not appraise the involved silk fabric on the basis of gross weight. The appraiser did not appraise the silk fabric in issue on the basis of weight of any kind, but on the basis of the unit of quantity in which it is usually bought and sold, to wit, the yard.

In the *Whittaker* case, *supra*, wherein the merchandise, talc, had been appraised on the basis of weight, plus the weight of the paper bags, our appellate court said, with reference to the proper manner of finding the value per ton, that:

\* \* \* we think it was the manifest duty of the collector, in order to ascertain the value per ton of the involved merchandise, to use the gross landed weight in accordance with the gross dutiable value, to properly ascertain the value per ton of the merchandise in question.

In view of the fact that the involved silk fabric was not appraised on the basis of gross landed weight, the *Whittaker* case, *supra*, does not stand for the proposition contended for by counsel for defendant, but rather supports the proposition that in order to determine the value per pound of these silk fabrics, the net landed weight should be divided into the final appraised value. The latter method of ascertaining the value per pound is the one contended for by counsel for the plaintiffs, and is also the one used in the preparation of exhibit 48. This appears to be the only proper method of determining the value per pound of the involved merchandise.

We, therefore, find from the evidence in the record before us that when the net landed weight of the involved silk fabric is divided into the total final appraised value of the merchandise, which we must accept in each of the involved protests, the silk fabric is valued in each instance at more than $5.50 per pound.

Having heretofore found that the involved silk fabric meets all the requirements of the two trade agreements, hereinbefore set out, it follows that it is properly dutiable at the rate of 45 per centum ad valorem, if imported or withdrawn from warehouse prior to January 1, 1948, and at the rate of 25 per centum ad valorem, if imported or withdrawn from warehouse subsequent to January 1, 1948, under paragraph 1205 of the Tariff Act of 1930, as modified by the trade agreement with France, and by the General Agreement on Tariffs and Trade, *supra*, as alleged by the plaintiffs.

To the extent indicated the specified claims in the protests listed in said schedule "A" are sustained; in all other respects and as to all other merchandise all the claims are overruled.

Judgment will be rendered accordingly.